Nos. 16-55727 & 16-55786

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AMERICANS FOR PROSPERITY FOUNDATION,
*Plaintiff-Appellee/Cross-Appellant*

v.

KAMALA D. HARRIS,
in her official capacity as the Attorney General of California,
*Defendant-Appellant/Cross-Appellee*

Appeal from the United States District Court for the Central District
of California, No. 2:14-cv-09448-R-FFM, Judge Manuel L. Real

BRIEF OF PLAINTIFF-APPELLEE/CROSS-APPELLANT
AMERICANS FOR PROSPERITY FOUNDATION

Harold A. Barza
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213.443.3000
halbarza@quinnemanuel.com

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Derek L. Shaffer
William A. Burck
Eric C. Lyttle
Keith H. Forst
Jonathan G. Cooper
Carolyn M. Homer
777 Sixth Street NW, 11th Floor
Washington, DC 20001
202.538.8000
derekshaffer@quinnemanuel.com

Dated: January 20, 2017

*Counsel for Americans for
Prosperity Foundation*

**CORPORATE DISCLOSURE STATEMENT**

Americans for Prosperity Foundation is a nonprofit corporation organized under the laws of Delaware. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................ii

Table of Authorities.................................................................................vii

Preliminary Statement ............................................................................. 1

Statement of Jurisdiction......................................................................... 4

Statement of the Issues Presented for Review ........................................ 4

Pertinent Constitutional, Statutory, and Regulatory Provisions ............ 5

Statement of the Case .............................................................................. 5

    A.    Form 990 and Schedule B...................................................... 5

    B.    The California Attorney General's oversight of charities and Blanket Schedule B Submission Requirement.......................................................................... 7

        1.    The Charitable Trusts Section:  the Registry of Charitable Trusts and the Investigative Unit .............. 7

        2.    Registration and periodic written reports..................... 8

        3.    California laws and regulations do not require submission of Schedule B ............................................... 8

        4.    The Attorney General's creation of the Blanket Schedule B Submission Requirement in 2010 through ad hoc deficiency letters.................................. 9

    C.    Schedule B plays a negligible role in the Attorney General's oversight of charities ........................................... 11

        1.    The Registry does not use Schedule B......................... 11

        2.    The Investigative Unit rarely uses Schedule B........... 11

3. The Attorney General can obtain Schedule Bs through targeted audit letters and subpoenas ............ 13

4. The Attorney General's two examples at trial confirm the lack of need for a Blanket Schedule B Submission Requirement ............................................. 14

D. The Attorney General does not keep Schedule B confidential ................................................................. 16

    1. The Registry published over 1778 Schedule Bs on its website ...................................................... 18

    2. The Registry made all of its 350,000 confidential documents publicly accessible ..................................... 21

    3. There is no accountability, notice, or redress for confidentiality breaches ............................................. 22

    4. The Attorney General's new confidentiality regulation maintains the Registry's deficient practices ..................................................................... 24

E. The Foundation ................................................................. 25

    1. The Foundation and its network ............................... 25

    2. The media and government officials are eager to expose donors of the Foundation and its network ....... 27

    3. The Foundation's known associates face threats and harassment ......................................................... 28

    4. The Attorney General's demand for Schedule B has a chilling effect ..................................................... 31

F. Procedural History ............................................................. 35

Summary of the Argument ....................................................... 37

Standards of Review.........................................................................40

Argument........................................................................................41

I.   The Attorney General's Blanket Schedule B Submission
     Requirement Is Facially Unconstitutional ...................................41

     A.   Governing legal principles ....................................................41

          1.   Relevant First Amendment rights..............................41

          2.   Exacting scrutiny .......................................................44

          3.   Facial challenge .........................................................49

     B.   The Blanket Schedule B Submission Requirement fails
          exacting scrutiny.................................................................50

          1.   Lack of a legitimate interest.....................................50

          2.   Lack of substantial relation......................................53

          3.   Lack of narrow tailoring ...........................................59

     C.   The district court erred in ruling that this Court's prior
          decisions preclude a facial challenge ..................................63

II.  The Blanket Schedule B Submission Requirement Is
     Unconstitutional As Applied to the Foundation...........................68

     A.   Demanding the Foundation's Schedule B is not
          substantially related to a governmental interest................68

     B.   Disclosing Schedule B to the Attorney General would
          expose the Foundation and its donors to a reasonable
          probability of threats, harassment, and reprisals...............69

     C.   The Attorney General's counterarguments ignore the
          proper scope of First Amendment protections ....................72

D. The district court's evidentiary rulings were within its sound discretion ........................................................................ 78

    1. Admission of evidence ................................................ 78

    2. Exclusion of evidence .................................................. 79

III. A Permanent Injunction Is Proper ................................................ 81

IV. Preservation of Preemption Argument ........................................... 84

Conclusion ............................................................................................... 86

Request for Oral Argument .................................................................... 87

Statement of Related Cases ................................................................... 88

Certificate of Compliance

Addendum

Certificate of Service

**Cases**

*ACLU v. Heller,*
378 F.3d 979 (9th Cir. 2004)..................................................................42

*Acorn Investments, Inc. v. City of Seattle,*
887 F.2d 219 (9th Cir. 1989)................................................................55

*Allee v. Medrano,*
416 U.S. 802 (1974)..............................................................................82

*Americans for Prosperity Foundation v. Harris,*
182 F. Supp. 3d 1049 (C.D. Cal. 2016) ...............................................36

*Americans for Prosperity Foundation v. Harris,*
809 F.3d 536 (9th Cir. 2015)........................................................ passim

*Anderson v. Bessemer City,*
470 U.S. 564 (1985)..............................................................................40

*Arizona Dream Act Coalition v. Brewer,*
818 F.3d 901 (9th Cir. 2016)................................................................41

*Arizona v. United States,*
132 S. Ct. 2492 (2012).........................................................................85

*Bates v. City of Little Rock,*
361 U.S. 516 (1960)...................................................................... passim

*Boorda v. Subversive Activities Control Board,*
421 F.2d 1142 (D.C. Cir. 1969).........................................................77

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000)........................................................................ 42, 45

*Brock v. Local 375, Plumbers International Union,*
860 F.2d 346 (9th Cir. 1988)..............................................................49

*Brown v. Socialist Workers '74 Campaign Committee (Ohio),*
459 U.S. 87 (1982).......................................................................... passim

*Buckley v. American Constitutional Law Foundation, Inc.,*
525 U.S. 182 (1999)................................................................................42

*Buckley v. Valeo,*
424 U.S. 1 (1976)........................................................................... passim

*California Bankers Ass'n v. Shultz,*
416 U.S. 21 (1974)..................................................................................45

*California First Amendment Coalition v. Woodford,*
299 F.3d 868 (9th Cir. 2002)..................................................................64

*Center for Biological Diversity v. Salazar,*
706 F.3d 1085 (9th Cir. 2013)................................................................64

*Center for Competitive Politics v. Harris,*
784 F.3d 1307 (9th Cir. 2015)........................................................ passim

*Chevron Corp. v. Penzoil Co.,*
974 F.2d 1156 (9th Cir. 1992)................................................................80

*Chula Vista Citizens for Jobs & Fair Competition v. Norris,*
782 F.3d 520 (9th Cir. 2015) (en banc)....................................45, 48, 49

*Citizens United v. FEC,*
558 U.S. 310 (2010)........................................................ 46, 74, 75, 77

*Community-Service Broadcasting of Mid-America, Inc. v. FCC,*
593 F.2d 1102 (D.C. Cir. 1978) (en banc) .............................................77

*Daily Herald Co. v. Munro,*
838 F.2d 380 (9th Cir. 1988)..................................................................40

*Davis v. FEC,*
554 U.S. 724 (2008)................................................................................44

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014)...................................................................84

*Doe v. Reed,*
561 U.S. 186 (2010)........................................... 45, 50, 72, 73

*Dole v. Service Employees Union,*
950 F.2d 1456 (9th Cir. 1991)................................................. 49, 59, 76

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006)...........................................................................82

*Erie v. Pap's A.M.,*
529 U.S. 277 (2000).........................................................................64

*FEC v. Machinists Non-Partisan Political League,*
655 F.2d 380 (D.C. Cir. 1981).............................................................53

*First National Bank of Boston v. Bellotti,*
435 U.S. 765 (1978).........................................................................75

*Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,*
812 F.2d 105 (3d Cir. 1987) .......................................................... 69, 76

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
561 U.S. 477 (2010).........................................................................81

*Garcia v. Green Fleet Systems, LLC,*
2014 WL 5343814 (C.D. Cal. Oct. 10, 2014)........................................78

*Gibson v. Florida Legislative Investigation Committee,*
372 U.S. 539 (1963)................................................................. passim

*Gikas v. Zolin,*
863 P.2d 745 (Cal. 1993)...................................................................51

*Hirsch v. Corban Corporations, Inc.,*
949 F. Supp. 296 (E.D. Pa. 1996) ......................................................79

*Horne v. Flores,*
557 U.S. 433 (2009)............................................................58

*Ibrahim v. U.S. Department of Homeland Security,*
835 F.3d 1048 (9th Cir. 2016)..................................... 40, 75

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.,*
538 U.S. 600 (2003)...................................................... 43, 68

*In re Primus,*
436 U.S. 412 (1978)............................................................47

*Jauregui v. City of Glendale,*
852 F.2d 1128 (9th Cir. 1988).................................. 41, 79, 81

*Klein v. City of San Clemente,*
584 F.3d 1196 (9th Cir. 2009)............................................82

*Kusper v. Pontikes,*
414 U.S. 51 (1973)..............................................................47

*Lightner v. Dauman Pallet, Inc.,*
823 F. Supp. 249 (D.N.J. 1992) .........................................79

*Local 1814, International Longshoreman's Ass'n v.*
*Waterfront Commission of New York Harbor,*
667 F.2d 267 (2d Cir. 1981) ..............................................76

*Louisiana ex rel. Gremillion v. NAACP,*
366 U.S. 293 (1961)..................................................... passim

*Lovell v. Poway Unified School District,*
90 F.3d 367 (9th Cir. 1996)...............................................40

*Martinez-Serrano v. INS,*
94 F.3d 1256 (9th Cir. 1996)..............................................81

*Maryland v. King,*
133 S. Ct. 1 (2012) (Roberts, C.J., in chambers) ...............83

*McConnell v. FEC,*
540 U.S. 93 (2003).................................................................... 74

*McCutcheon v. FEC,*
134 S. Ct. 1434 (2014)...................................................... 48, 84

*McIntyre v. Ohio Elections Commission,*
514 U.S. 334 (1995)........................................................... 42, 59

*NAACP v. Alabama ex rel. Patterson,*
357 U.S. 449 (1958)........................................................... passim

*NAACP v. Button,*
371 U.S. 415 (1963)....................................................................47

*Pacific Operators Offshore, LLP v. Valladolid,*
132 S. Ct. 680 (2012)..................................................................51

*Perry v. Schwarzenegger,*
591 F.3d 1147 (9th Cir. 2010)........................................ passim

*Porter v. Bowen,*
496 F.3d 1009 (9th Cir. 2007)....................................................61

*Red Lion Hotels Franchising, Inc. v. MAK, LLC,*
663 F.3d 1080 (9th Cir. 2011)....................................................51

*Riley v. National Federation of Blind of North Carolina, Inc.,*
487 U.S. 781 (1988)........................................................... 44, 62

*Roberts v. Pollard,*
393 U.S. 14 (1968),
*summarily affirming* 283 F. Supp. 248 (E.D. Ark. 1968) ............ passim

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
547 U.S. 47 (2006)......................................................................42

*Shelton v. Tucker,*
364 U.S. 479 (1960)........................................................... passim

*Southern Oregon Barter Fair v. Jackson County,*
372 F.3d 1128 (9th Cir. 2004)..........................................64, 67

*Stormans, Inc. v. Selecky,*
586 F.3d 1109 (9th Cir. 2009)..........................................82

*Sweezy v. New Hampshire,*
354 U.S. 234 (1957)..........................................43

*Talley v. California,*
362 U.S. 60 (1960)..........................................42

*Turner Broadcasting System, Inc. v. FCC,*
512 U.S. 622 (1994)..........................................64

*United States Servicemen's Fund v. Eastland,*
488 F.2d 1252 (D.C. Cir. 1973),
*reversed on other grounds*, 421 U.S. 491 (1975)..................78

*United States v. Stevens,*
559 U.S. 460 (2010)..........................................49, 63

*United States v. Whittemore,*
776 F.3d 1074 (9th Cir. 2015)..........................................79

*Video Software Dealers Ass'n v. Schwarzenegger,*
556 F.3d 950 (9th Cir. 2009),
*affirmed*, 564 U.S. 786 (2011)..........................................64

*Village of Schaumburg v. Citizens for a Better Environment,*
444 U.S. 620 (1980)..........................................44, 61

*Wagner v. County of Maricopa,*
747 F.3d 1048 (9th Cir. 2013)..........................................79

*Watchtower Bible & Tract Society of New York, Inc. v.*
*Village of Stratton,*
536 U.S. 150 (2002)..........................................42

*Wilkerson v. Wheeler,*
  772 F.3d 834 (9th Cir. 2014) .................................................................. 41

**Statutes**

26 U.S.C. § 6104(b) ........................................................................... 6, 84

26 U.S.C. § 6104(c) .............................................................................. 84

26 U.S.C. § 6104(c)(3) .......................................................................... 85

26 U.S.C. § 6104(d) ............................................................................... 6

26 U.S.C. § 6104(d)(3)(A) ..................................................................... 84

26 U.S.C. § 7213 .................................................................................... 6

26 U.S.C. § 7431 .................................................................................... 6

28 U.S.C. § 1291 .................................................................................... 4

28 U.S.C. § 1331 .................................................................................... 4

28 U.S.C. § 1343(a)(3) ........................................................................... 4

Cal. Civil Code § 1798.24 .................................................................... 23

Cal. Gov. Code § 12510 .......................................................................... 7

Cal. Gov. Code § 12585 .......................................................................... 8

Cal. Gov. Code § 12586 .......................................................... 8, 51, 52, 65

Cal. Gov. Code § 12586(a) .................................................................... 51

Cal. Gov. Code § 12586(b) .................................................................... 52

Cal. Gov. Code § 12590 ........................................................................ 24

Cal. Gov. Code § 12599.7(a)(1) ....................................................... 50, 51

Cal. Gov. Code §§ 12580–12599.8 ....................................................... 50

**Other Authorities**

Cal. Code Regs., tit. 11, § 301 ....................................................................8

Cal. Code Regs., tit. 11, § 304 ....................................................................8

Cal. Code Regs., tit. 11, § 305 ....................................................................8

Cal. Code Regs., tit. 11, § 310(b) ..............................................................24

Federal Rule of Appellate Procedure 4(a)(1)(A)........................................4

Federal Rule of Appellate Procedure 4(a)(3) .............................................4

Federal Rule of Civil Procedure 60(b)(5) .................................................58

Federal Rule of Evidence 602.....................................................................79

Federal Rule of Evidence 803(3) ...............................................................78

IRS, Instructions for Form 990 (2016),
   https://www.irs.gov/pub/irs-pdf/i990.pdf............................................ 9, 53

Marion R. Fremont Smith, *Governing Nonprofit Organizations:
   Federal and State Law* (2004) .............................................................55

Perry Chiaramonte, *California snafu releases personal info of nearly
   4,000 gun safety instructors*, Fox News (Jan. 18, 2017),
   http://www.foxnews.com/us/2017/01/18/california-snafu-releases-
   personal-info-nearly-4000-gun-safety-instructors.html ......................58

S. Rep. No. 91-552 (1969),
   *reprinted in* 1969 U.S.C.C.A.N. 2027, 2081 ..........................................6

The California Attorney General is defying settled constitutional law by casting a dragnet in demanding annual lists of charities' major donors. As confirmed by cases like *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), the First Amendment entitles charities to maintain in confidence the names of their supporters. A State can overcome this right only by satisfying "exacting scrutiny," which requires proof that the disclosure demand is substantially related to a compelling or important interest and is narrowly drawn to avoid unnecessary abridgement of associational freedoms. The Attorney General has fallen woefully short of making the requisite showing.

Without legal authorization, the Attorney General has, through ad hoc deficiency letters sent to thousands of charities, created a sweeping *de facto* requirement that all charities in California annually submit their "Schedule B," a confidential form that lists the names and addresses of the charity's major donors nationwide. The Attorney General asserts both that these Schedule Bs are needed on hand to investigate charitable fraud and that they are kept confidential. These assertions proved false at trial.

1

Following a bench trial, the district court found as a matter of fact that "[t]he record before the Court lacks even a single, concrete instance in which pre-investigation collection of a Schedule B did anything to advance the Attorney General's investigative, regulatory or enforcement efforts." ER6. Over the past ten years, the Attorney General has conducted at least 540 investigations of charitable fraud, yet only five of the 540—*i.e.*, about 0.92% of investigations, or one investigation every two years—implicated Schedule B; even in those few instances, the Attorney General had access to the pertinent Schedule B information from other sources. Rather than collect tens of thousands of Schedule Bs each year, the Attorney General is perfectly able to obtain the handful of Schedule Bs used in investigations by issuing targeted audit letters or subpoenas.

The district court also found that "the Attorney General's assurances and contentions as to the confidentiality of Schedule Bs" are "irreconcilable" with the "pervasive, recurring pattern of uncontained Schedule B disclosures" proven at trial. ER9. Trial revealed that the Attorney General's staff posted over 1778 confidential Schedule Bs on a public website for all to see. Still worse, during the course of litigation

more than 350,000 confidential documents—including *all* Schedule Bs—were also accessible by anyone with a web browser, until the Attorney General was alerted to the glitch and then spent more than a week quietly fixing it. Before concessions were extracted from the Attorney General's witnesses under oath here, known breaches of Schedule B confidentiality had simply been covered up; not a single breach had been reported to affected charities or donors, and in multiple briefs to this Court the Attorney General submitted there was no evidence of any breach. Such recurring, surreptitious breaches of confidentiality chill contributions by donors who fear public exposure.

On this record, the Attorney General's blanket demand for all Schedule Bs cannot withstand exacting scrutiny. The constitutional violation extends to all charities, and certainly, at a bare minimum, to Americans for Prosperity Foundation ("**Foundation**") and its donors, who (as the trial court found) face death threats, harassment, and reprisals when their identities are exposed. This Court should hold that the Attorney General's sweeping demand for Schedule B is facially unconstitutional or else, at the very least, unconstitutional as-applied to

the Foundation.  Any contrary holding would eviscerate freedoms long celebrated under *NAACP v. Alabama*  and its progeny.

**STATEMENT OF JURISDICTION**

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).  This Court has jurisdiction under 28 U.S.C. § 1291.  The district court entered final judgment on April 21, 2016.  ER1–12. Twenty-seven days later (May 18), the Attorney General noticed an appeal, ER74, making it timely under Federal Rule of Appellate Procedure 4(a)(1)(A).  Thirteen days after that (May 31), the Foundation noticed its cross-appeal, SER1–2, making it timely under Rule 4(a)(3).

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

The California Attorney General demands that tens of thousands of charities annually submit "Schedule B," a form listing the names and addresses of the charity's major donors.

1. Did the district court err by considering itself bound to uphold the facial constitutional validity of this Schedule B disclosure requirement based on Circuit precedent that had been decided on an incomplete record at the preliminary-injunction phase?

4

2. Did the district court correctly conclude, based on the full record at trial, that the Schedule B disclosure requirement as-applied to the Foundation is unconstitutional?

3. Does federal tax law preempt the disclosure requirement?

## PERTINENT CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS

**U.S. Constitution, First Amendment**:  "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble . . . ."

Additional pertinent provisions are included in an addendum.

## STATEMENT OF THE CASE

### A.  Form 990 and Schedule B

The U.S. Internal Revenue Service ("**IRS**") requires nonprofit organizations to file Form 990 annually with the IRS.  SER76–87. Schedule B to Form 990, titled the "Schedule of Contributors," has existed since 2000 and lists the names, addresses, and donation amounts of individuals who either contributed $5,000 or more in a given tax year or accounted for 2% of all charitable receipts that year. SER480–85.  By law, a charity must make Form 990 and all its

5

schedules—except Schedule B—publicly available.  26 U.S.C. § 6104(b), (d).[1]

Congress and the IRS treat Schedule B as highly confidential, protecting it from public inspection and imposing civil and criminal penalties for unauthorized disclosure.  26 U.S.C. §§ 6104(b), 7213, 7431. The legislative history explains that Congress explicitly provided for donor privacy "because some donors prefer to give anonymously" and to "require public disclosure in these cases might prevent the gifts." S. Rep. No. 91-552 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2027, 2081.

Confidentiality is so important that the IRS instructs charities that "[i]f an organization files a copy of Form 990 . . . and attachments, with any state, it should **not** include its Schedule B . . . in the attachments for the state, unless a schedule of contributors is specifically required by the state." *E.g.* SER452, 468, 478, 484 (emphasis added).  The IRS warns charities that "[s]tates that do not require the information might make the schedule available for

_____

[1]   Except where noted, references to "Schedule B" in this brief denote only the confidential Schedule B prepared by public charities and not the nonconfidential Schedule B prepared by private foundations.  *See* ER705–06.

inspection along with the rest of the Form 990[.]"  *E.g.* SER452.  That

warning was prescient with respect to California.

> **B.     The California Attorney General's oversight of charities and Blanket Schedule B Submission Requirement**
>
> **1.     The Charitable Trusts Section:  the Registry of Charitable Trusts and the Investigative Unit**

The Attorney General of California heads the California

Department of Justice, which houses the Charitable Trusts Section that

oversees charities in California.  Cal. Gov. Code § 12510; ER737–39,

1047.  Tania Ibanez leads the Section, ER992, having succeeded

Belinda Johns, who headed the Section for over a decade, ER550–52,

992.

The Charitable Trusts Section has "two parts":  (1) the Registry of

Charitable Trusts ("**Registry**"), and (2) the unit handling audits,

investigations, and legal enforcement ("**Investigative Unit**").  ER553–

54, 558–59.  The Registry manages registration of charities in

California, processes annual registration renewals, and maintains a

website of registered charities.  ER738, 746–47, 888, 956–57.  The

current Registrar is David Eller; in 2015 he succeeded Kevis Foley, who

had been the Registrar since 2005.  ER737, 888.

The Investigative Unit audits charities' finances and investigates and prosecutes cases of charitable fraud.  ER967, 994–95.  The lead investigator is Steve Bauman, who has been an investigative auditor with the Charitable Trusts Section since 1988.  ER966.

## 2.    Registration and periodic written reports

Charities that fundraise in California must register with the Registry and then renew their registration each year by filing "periodic written reports."  Cal. Gov. Code §§ 12585, 12586; Cal. Code Regs., tit. 11, §§ 304, 305.  A periodic written report consists of two forms:  the Annual Registration Renewal Fee Report ("**RRF-1**"), and the IRS Form 990.  Cal. Code Regs., tit. 11, § 301.

California has approximately 118,000 charities registered.  ER889.  At least 60,000 file renewal papers each year; over 40,000 are delinquent in filing renewals.  ER8, 555, 738.

## 3.    California laws and regulations do not require submission of Schedule B

No California law or regulation states that charities must file Schedule B as part of their periodic written reports.  ER621, 634–36, 771; SER1024.  The current contents of the periodic written reports were specified by regulatory amendments in 2005; the rulemaking file

8

for those amendments contains a copy of every form referenced or incorporated in the regulations—Schedule B is not among them. ER645–47; SER344–99, 1036–40, 1043. Consistent with the decision to exclude Schedule B, the Attorney General's official Guide for Charities indicates a charity must file its "Form 990" and its "Schedule A" but *not* its Schedule B. ER567, 655–61; SER125–184. At no point has the Attorney General ever issued any "mass notice" to all charities stating that Schedule B is required. ER773.

In this litigation, the Attorney General has pointed to the RRF-1 instructions, which direct charities to file "Form 990 . . . and attachments." AG Brief 7; ER1129. But "schedules" are not "attachments." *See* IRS, Instructions for Form 990, at 8 (2016), https://www.irs.gov/pub/irs-pdf/i990.pdf (distinguishing between the "Core" Form 990, "Schedules," and "Attachments"). And instructions on an administrative form are not law. ER648–49.

> ### 4. The Attorney General's creation of the Blanket Schedule B Submission Requirement in 2010 through ad hoc deficiency letters

In 2010, Belinda Johns purportedly had a sudden "realization" that charities were (precisely per the IRS's directive) not submitting

9

Schedule B to California with their registration renewals. ER581–82, 608–11. The Registry then, in August 2010, began sending delinquency letters to individual charities, on "an ad hoc basis," for failing to file an unredacted Schedule B. SER201–04, 488, 1058; ER374–77. These notifications were not systematic; the Foundation, for example, did not receive a Schedule B deficiency letter until 2013, even though it had registered annually with the Registry since 2001 without filing an unredacted Schedule B. ER4, 1291; SER6, 531–34.

What started as a single ad hoc letter snowballed into an avalanche. Before 2010, no Schedule B deficiency letters were sent, even though at least "half or two-thirds" of charities were not filing Schedule B with their annual registration renewals. ER583. Between mid-2010 and mid-2015, California issued around 8000 Schedule B deficiency letters. ER374–77. The upshot appears to be institution around 2010 of a *de facto* requirement that all charities registered in California must annually submit Schedule B as part of their periodic written reports—hereinafter called the "**Blanket Schedule B Submission Requirement**"—even though no such requirement is spelled out in California law or regulation.

Notably, the demand for Schedule B in these deficiency letters is concededly *not* an exercise of the Attorney General's *subpoena* power. ER663–67.  Instead, it is a purported exercise solely of the Attorney General's power to require periodic written reports.  ER636, 756–57; 770–71; SER185–86, 201–06, 434–44.  The Charitable Trusts Section can issue deficiency letters for incomplete periodic reports on its own, but the process for issuing subpoenas is much more rigorous and requires special approval.  ER661–67, 756, 1028–29.

### C.     Schedule B plays a negligible role in the Attorney General's oversight of charities

#### 1.     The Registry does not use Schedule B

As the district court found, "the Attorney General does not use the Schedule B in its day-to-day business."  ER4.  Indeed, the Registry *never* uses Schedule B.  ER831–32, 901.

#### 2.     The Investigative Unit rarely uses Schedule B

As for the Investigative Unit, it "virtually never" uses Schedule Bs.  ER11; *see also* ER4 (investigators "seldom use Schedule B when auditing or investigating charities").  The Investigative Unit never proactively reviews any Registry filings (including Schedule Bs).  ER674, 985–987, 1027; SER986.  Rather, the Investigative Unit looks at

Registry documents only "when a complaint comes in" that could lead to an investigation.  ER558–60, 968–69, 985, 996–97.

When a complaint does come in, Schedule B is of negligible use.  ; SER163, 989.  Schedule B has "never been used" as "the triggering document" to open or start an investigation, ER976–77, 1028, 1060, nor has a Schedule B ever obviated an investigation, ER1060; SER995.  Simply put, "investigations are not Schedule B driven."  SER1002, 1008–09.

Even when a complaint turns into an actual investigation, a Schedule B has negligible utility, at best.  Over the past ten years, the Charitable Trusts Section has conducted at least 540 investigations.  ER4, 982.  After searching ten years of records, the Investigative Unit identified only five cases (*i.e.*, about 0.92% of investigations, or one every two years) where Schedule B was even implicated.  ER4, 981–82.  In each of that handful of instances, the Investigative Unit did not know if it had used the Registry's copies of the Schedule Bs, or even whether the Registry had them, and all of the relevant information on the Schedule Bs could have been obtained from other sources.  ER4, ER979, 983, 986–87, 990–91; SER993, 1000.  Accordingly, the Attorney

General's lead investigator, Steve Bauman, acknowledged that he was able to audit charities "successfully" and find "wrongdoing" even "[w]ithout the Schedule B." ER986; *see also* ER979–980. The one time that Bauman recalled personally using a Schedule B, he "could have completed that one investigation . . . without the Schedule B." ER983.

### 3. The Attorney General can obtain Schedule Bs through targeted audit letters and subpoenas

In the rare instance when investigative personnel do have reason to review a Schedule B, they can obtain it through an audit letter or subpoena. It is the Attorney General's uniform practice to send "an audit letter" to a charity under investigation "very early on in the process to obtain documents," including Schedule B. ER987–89, 997–98; *see also* ER560–61, 568–70, 1028–29, 1063. Even when documents are *already* on file with the Registry, investigators *still* routinely request them in the audit letter, thereby ensuring that they have the charity's up-to-date paperwork. *See* SER535–36, 1005.

There is no appreciable downside to asking for Schedule Bs through audit letters. Bauman could not recall a single "instance where [he] asked a charity for their Form 990" or Schedule B in an audit letter "and they refused to provide it," ER988–89, or tampered with a

13

document before providing it, SER982.  Tania Ibanez added that she is not "aware of any scenario" where "a request for Schedule B [in an audit letter] tipped anyone off" and thereby "frustrated or undermined the ensuing investigation or audit."  ER1029.

If a charity did ever refuse to provide a Schedule B in response to an informal audit letter, the Attorney General could demand it via a formal administrative subpoena.  ER677–78, 1028.

Despite being able to obtain Schedule Bs on an as-needed basis through audit letters and subpoenas, the Attorney General has never so much as "considered any alternative to an across-the-board demand for Schedule Bs."  ER1030–32; SER108.

> **4. The Attorney General's two examples at trial confirm the lack of need for a Blanket Schedule B Submission Requirement**

At trial, the Attorney General was able to identify ***only two*** actual investigations where Schedule B supposedly mattered:  those of (1) L.B. Research; and (2) the Cancer Fund of America.  ER577–78, 703–04, 1013–14, 1022–23; ER1736–89; *see also* AG Brief 51–54.

L.B. Research was a private foundation engaged in self-dealing:  a donor contributed to L.B Research to endow a chair at UCLA for

14

himself.  ER577–78.  Schedule B played no role in uncovering this fraud:  UCLA discovered the self-dealing and reported it; the Attorney General thereafter did not investigate until years later.  ER703–04, 1022–23; SER774.  Moreover, as a *private foundation* L.B. Research's Schedule B is *public*, not confidential.  ER704–06, 1023; SER775–93.  Thus, the Attorney General was able to prosecute L.B. Research without the Blanket Schedule B Submission Requirement.  ER1014.

As for the Cancer Fund of America, it was a charity that had been sued by the Federal Trade Commission and all 50 states for committing multiple types of fraud.  ER1358–1505.  The investigation and lawsuit were prompted by media reports and other sources—not by review of a Schedule B.  SER843–939, 945–56.  Indeed, other states—47 of which police charities without requiring submission of Schedule B, *see* ADD-35 to ADD-43—have expressly cited the Cancer Fund of America case as a concrete example showing that Schedule B is *not* needed to successfully investigate and prosecute charitable fraud.  SER814, 964, 967.  Schedule B's supposed value here was identified by an attorney with the Investigative Unit who suddenly realized—more than three years after being assigned to the case—that Schedule B might be useful

during a deposition she was about to take.  ER1747–49.  The Schedule B that the attorney seized on had been obtained through a targeted discovery subpoena, further confirming the lack of warrant for the blanket demand that all charities annually submit Schedule B to the Registry.  ER1756.

In light of this evidence, the district court found after trial that "[t]he record before the Court lacks even a single, concrete instance in which pre-investigation collection of a Schedule B did anything to advance the Attorney General's investigative, regulatory or enforcement efforts."  ER6.

## D.    The Attorney General does not keep Schedule B confidential

In defending the Blanket Schedule B Submission Requirement, the Attorney General has consistently represented that the Charitable Trusts Section keeps Schedule Bs "confidential," such that only the Charitable Trusts Section can access them.  ER759.  Indeed, the Attorney General has represented in submission, after submission, after submission to this Court that there is "no evidence" that the confidentiality of a Schedule B has ever been breached.  *See* Answering Brief, *Center for Competitive Politics v. Harris*, No. 14-15978, ECF 17-1,

at 32–33 (9th Cir. July 8, 2014) ("the fact remains that [Schedule B] information *is* kept confidential and there is no evidence to suggest that any 'inadvertent disclosure' has occurred or will occur"); Appellant's Opening Brief, *Americans for Prosperity Foundation v. Harris*, No. 15-55446, ECF 12-1, at 9–10 (9th Cir. May 7, 2015) ("There is no evidence that the Registry has ever breached the confidentiality of Schedule B information."); Appellant's Reply Brief, *Americans for Prosperity Foundation v. Harris*, No. 15-55446, ECF 23, at 15 (9th Cir. July 8, 2015) ("the Attorney General is required to keep, does keep, and always has kept Schedule B confidential," and there is a "lack of evidence that the Registry publicly discloses Schedule B information").

The Attorney General has been equally clear in disavowing any interest in publishing confidential Schedule Bs to the general public. ER601; *see also Americans for Prosperity Foundation v. Harris* ("*AFPF*"), 809 F.3d 536, 542 (9th Cir. 2015) ("the Attorney General agrees with the plaintiffs that Schedule B information should not be publicly disclosed").

### 1. The Registry published over 1778 Schedule Bs on its website

Contrary to the purported confidentiality policy and representations surrounding same, the Attorney General has systematically failed to protect the confidentiality of Schedule Bs she obtains. Foundation searches discovered 1778 Schedule Bs posted on the Registry's website, hundreds of which had been publicly available for years and dozens of which were posted during the pendency of this litigation. ER9, 383–88, 1292–1325, 1349–53; SER207–93, 402–06, 410–29, 971–75. Affected charities include many associated with controversial causes or vulnerable groups, including:

- American Center for Law and Justice
- Catholic Charities of California
- Concerns of Police Survivors
- Greenpeace
- MoveOn.Org Civic Action
- People for the Ethical Treatment of Animals
- Planned Parenthood
- Rape Trauma Services
- San Francisco Child Abuse Prevention Center

- Zionist Organization of America

SER209, 219, 262, 264, 269, 293, 403–04, 421, 973.

Well before the Foundation pointed out the 1778 Schedule Bs available online, the Attorney General knew of at least 25–30 other Schedule Bs published on the Registry's website, but the Attorney General hid that fact from this Court when claiming in its briefs that there was "no evidence" of any inadvertent disclosures. ER816–17, 1003, 1043; SER187–200, 407–09, 430–33. For example, on July 3, 2012—years before the Attorney General's contrary representations to this Court—counsel for Planned Parenthood Affiliates of California emailed Belinda Johns to complain that the Registry had posted on its website his client's Schedule B, "including all the names and addresses of *hundreds of donors*." ER1139–40 (emphasis added). Counsel explained that "the unintended public availability of this information is potentially damaging to both our client and its donors, and the longer it remains available, the greater risk it poses." ER1139. At trial, Johns agreed that "posting that kind of information publicly could be very damaging to Planned Parenthood." ER626–27.

The Registry's processes are a fundamental part of the problem. There are over 60,000 registration renewals each year; 90% are filed in paper copy, which the Registry processes by hand before scanning into its electronic record system. ER741, 747, 899–900. To minimize cost, seasonal workers and student interns conduct the "vast majority" of paper processing and scan preparation. ER795–96. The overwhelming volume of paper, coupled with the tediousness of the work, results in the Registry routinely mismarking confidential Schedule Bs as public and then uploading them to its website. ER632–34, 1354–57, 1690; *see also* SER1033. Until recurring gaffes were laid bare in this case, however, the Registry had not undertaken the most rudimentary computer searches to catch and remove mistakenly posted Schedule Bs. ER605–06, 630–31, 817–18, 851, 920–23; SER1013–14.

The trial court found that this "pervasive, recurring pattern of uncontained Schedule B disclosures—a pattern that has persisted even during this trial—is irreconcilable with the Attorney General's assurances and contentions as to the confidentiality of Schedule Bs collected by the Registry." ER9. The court further found that, as stated by the current Registrar, David Eller, "the Registry has more work to do

before it can get a handle on maintaining confidentiality." ER9; *see also* ER921, 954. Animating that concession is the Registry's systematic, pervasive, longstanding disregard of the sort of procedures and practices that would be prerequisite to any meaningful assurance of confidentiality. ER691–99, 873–78, 924–26; SER985.

### 2. The Registry made all of its 350,000 confidential documents publicly accessible

Publication of over 1778 Schedule Bs was the tip of the iceberg. *All* of the Registry's approximately 350,000 documents marked as confidential—including Schedule Bs—were also publicly accessible through the Registry's website. ER866, 937, 1035–36.

They were available because the Registry's system for storing and protecting documents was incompetently designed. The Registry sequentially numbers scanned documents, electronically marks the documents as either public or confidential, and then automatically posts on its website links to the documents marked public. ER390–91. But the Registry failed to *block* access to documents marked confidential, which are numbered in the same sequence and stored in the same database. To access documents marked as confidential, all a person had to do was type into a web browser any document number in the

sequence that was not associated with one of the public documents posted on the Registry's website. ER391–92 (walking through example of counting up in a document sequence for the Pregnancy Counseling Center of Ukiah). After operating with this particular vulnerability for at least six months, SER1016–18, 1064, the Registry spent eight days fixing it during this lawsuit. ER936–46. Throughout those eight days, the Attorney General did nothing to mitigate this vulnerability; thereafter, the Attorney General never reported the lapse to anyone. ER941–46, 1337–42; SER552–53, 749–50, 1016–18, 1064. While leaving this gaping vulnerability unaddressed for more than a week, the Attorney General ignored technical personnel who suggested an emergency fix that would prevent disclosure of confidential documents, such as disabling the website. ER937–47, 1036–1041.

### 3. There is no accountability, notice, or redress for confidentiality breaches

The Attorney General has never notified any affected charities or donors that their confidential information was exposed. ER631–32, 765–66, 819–21, 915, 946, 951, 1039, 1053. Even when a charity discovers for itself that its Schedule B has been published, "there is no redress." ER1048–49.

The Attorney General does not even consider posting Schedule Bs on the Registry's website to be a "breach" of confidentiality. Tania Ibanez, the current head of the Charitable Trusts Section, testified that "if every confidential Schedule B ever obtained by the [R]egistry were inadvertently uploaded for public access via links and publicly downloaded, there would [be] no breach of the confidentiality policy as [I] understand it." ER1033–34. Similarly, Ibanez testified that, while providing assurances of confidentiality throughout this litigation, she has silently interpreted California law as containing a breathtaking array of "operative" exceptions that allow disclosure of Schedule B to other agencies, government officials, universities, and members of the public. ER1054–56; *see also* Cal. Civil Code § 1798.24.

Consistent with this overall stance, the Attorney General has never punished anyone for improperly disclosing a Schedule B. ER763, 813–14, 918–19, 945. "[T]here [are] no penalties . . . for inadvertent disclosure of Schedule B." SER1070.

### 4. The Attorney General's new confidentiality regulation maintains the Registry's deficient practices

This Court previously held that the Attorney General's assurance of confidentiality was likely contrary to California law, which mandated public access to every Schedule B submitted in a periodic written report. Cal. Gov. Code § 12590; *AFPF*, 809 F.3d at 542. At no time prior to trial and entry of final judgment in this case did the Attorney General address that problem. Instead, months later, in July 2016, the Attorney General amended a regulation to provide that Schedule Bs would be confidential under California law. Cal. Code Regs., tit. 11, § 310(b); *cf.* ADD-17 (prior version of § 310).

According to the Attorney General, however, the regulatory amendments merely "codify" the Attorney General's longstanding approach to confidentiality, without doing anything to improve upon it. SER490. As the trial court found, that current practice has resulted in a "pervasive, recurring pattern of uncontained Schedule B disclosures." ER9.

24

### E.    The Foundation

#### 1.    The Foundation and its network

Americans for Prosperity Foundation is a 501(c)(3) charity headquartered in Virginia.  SER5.  The Foundation educates the public about "free-market solutions that could help better their lives."  ER298– 99.  To that end, the Foundation hosts conferences, issues policy papers, and runs educational programs to engage citizens nationwide about the benefits of the free market.  ER298–99.  The Foundation actively works to advance free-market policies, including by hosting events and fundraising in California.  ER287, 296–99.  Charles Koch and David Koch helped establish the Foundation, and David Koch is the chairman of the board of directors.  ER230.

The Foundation's donors are the "lifeblood of [the] organization."  ER196.  Schedule B donors are especially vital because they are the Foundation's largest contributors—those who account for at least 2% of the Foundation's revenue.  ER196–97, 201, 318–320.  Losing even one Schedule B donor could sap the Foundation's finances, requiring it to "shut down parts of our operation."  ER201.  Loss of a Schedule B donor would also threaten a ripple effect, reducing contributions throughout

the Foundation's donor base, as other donors would fear having their own identities disclosed.  ER311, 318, 335, 513, 527–28.  To protect its donors, Foundation treats all of its donor-identifying information— including its Schedule B—as strictly confidential.  ER195, 304, 308–09, 325–27, 335–36.

The Foundation has been successfully registered with the Attorney General since 2001 and has filed its Form 990 as part of its annual registration renewal every year, without including the names and addresses of its donors on Schedule B.  ER4; SER531–34.  The Foundation "has never been the subject of a complaint of any sort," nor has it been investigated by the California Attorney General for charitable misconduct.  ER666–67, 679.  At no point before the Foundation initiated this lawsuit did the Attorney General allege or suspect any wrongdoing by the Foundation.  ER1020–21; SER1073–74.

The Foundation has a sister organization named Americans for Prosperity ("**Americans for Prosperity**"), which is a 501(c)(4) organization focused on direct issue advocacy.  ER227–29, 298.  The general public, including "protestors," do not "differentiate between the Foundation and Americans for Prosperity."  ER202–03; *see also* ER298.

Both the Foundation and Americans for Prosperity are members of the Freedom Partners Network, a network of "like-minded organizations" seeking to "really further free enterprise, free society-type issues." ER230.

### 2. The media and government officials are eager to expose donors of the Foundation and its network

News outlets and government officials express fervent interest in exposing the identities of donors to the Foundation and its "ideological network," pejoratively dubbed the "Kochtopus." SER559. Websites and bloggers have gleefully published lists and audio recordings of perceived or prospective donors at events where the Foundation may engage in fundraising, such as seminars hosted by Freedom Partners. *E.g.*, ER197–98, 266, 299, 1343–48; SER294, 573–92, 738–39, 757. In 2013, the National Journal published the Foundation's 2001 and 2003 Schedule Bs—even though they were a decade old—after it found them mistakenly posted on a state Attorney General's website. ER199–200; SER554–57. As the article noted, "it's impossible to know how much more money is floating around out there *until someone else hits the wrong button and accidentally uploads an otherwise hidden document to a public database.*" SER557 (emphasis added).

Federal and state officials have encouraged the outing of donors. President Obama, for instance, has repeatedly complained that "we don't know where this money is coming from" for Americans for Prosperity, SER598–99, and that it is a "problem" that they do not "have to disclose who their donors are," SER641. *See also* ER247–53; SER622–23, 663, 675, 687, 701, 716, 729, 738–39. The Attorney General of California has likewise complained about groups "maintaining the anonymity of their donors" when they are purportedly affiliated with Charles and David Koch. SER753; *see also* ER262–63. Other prominent politicians have attacked Americans for Prosperity and its supporters as well. ER254.

### 3. The Foundation's known associates face threats and harassment

On a "regular basis," the Foundation faces significant security threats. ER311–12. Numerous threats have been sent to the Foundation via social media, email, and telephone. ER315; SER523. A contractor who worked at the Foundation's headquarters posted online about working in the "belly of the beast" and threatening to slit the throat of the Foundation's President. ER212, 313, 336; SER1097–98. The Foundation's headquarters also had to be evacuated after a bomb

threat.  ER313–14; SER522.  In the field, employees are stalked, threatened, shouted at, and spit upon.  ER316, 340–41; SER1094, 1128–29.

Some of the attacks are high-tech.  The hacker group Anonymous disabled Americans for Prosperity's website.  ER269–70, 300; SER537–42.  An online video game depicted a first-person player shooting zombies at an office location with "Americans for Prosperity" banners.  ER447–48; SER550.

Other attacks are physical and violent.  At the Foundation's annual summit in Washington D.C., protestors blocked exits, "tried to push and shove and keep people in the building," and knocked a 78-year-old Foundation attendee down the stairs.  ER468–70; SER758–59, 762.  Protestors in Michigan stormed an event tent set up by Americans for Prosperity "with knives or box-cutters cutting at the ropes of the tent," collapsing the heavy tent on at least a dozen attendees.  ER205–07; SER551.  Another violent protestor punched a television reporter covering the commotion.  ER209, 352–53.  Charles and David Koch, two high-profile associates of the Foundation, have faced "a lot of" threats, attacks, and harassment, including death threats, firebomb threats,

and threats to "[s]hoot them as traitors" and "put a bullet in the[ir] head[s]." ER270–75.

Known and perceived donors are targeted too. The R and M Fink Foundation, a private family foundation that publicly reports its contributions to the Foundation, received "numerous" death threats. ER321–22. After a blog posted a list of suspected Foundation donors, they faced "personal threats" and boycotts against their businesses. ER197–98. Other actual, potential, or perceived donors report that they have been targeted for audits and investigations by government officials as a result of their donations. ER303, 336–37; SER1082, 1120–21. A Foundation official who works with donors testified that concerns about government targeting and retaliation are "consistent" for all of the donors that she "meet[s] with." ER337–38. These concerns also have a ripple effect, as one donor's story "carries through the whole donor community." ER346.

Art Pope, whose family foundation contributes publicly to the Foundation, has received an "assassination" threat due to his foundation's donations, ER432–34, 1328–36, and has been harassed by "a series of articles" that falsely accuse him of "funding global warming

deni[al]" and racism.  ER430–32, 460–64; SER543–49.  His business also suffered boycotts and picketing largely because of his affiliation with the Foundation.  ER450–54.  As a result of this retaliation, Pope has considered ending his contributions to the Foundation.  ER471.  His experience serves as a "cautionary tale" for would-be supporters of the Foundation, to the extent their identities may become publicized.  ER472.

### 4. The Attorney General's demand for Schedule B has a chilling effect

Confidential and anonymous giving has a long history in American life, and donors reasonably insist on it for a host of reasons, including to avoid threats and harassment.  ER519; SER496–507.  When donor anonymity is compromised, donors and nonprofit participants withdraw or reduce their monetary support and participation.  SER1038–1056; ER519–21.  All organizations are susceptible to this chilling effect, but controversial causes especially so.  As Belinda Johns testified, a donor list "for an organization like Planned Parenthood" is "something that needs undoubtedly to remain private, because there are people who are antagonistic to Planned Parenthood.  Donors to Planned Parenthood . . . don't want to be

targeted." ER626–27. These same concerns "would be true for any organization." ER626–27; SER1030–31. Particularly in California, donors to controversial causes have faced drastic reprisals for their donations. ER519–20.

Consistent with the threats and harassment encountered by known affiliates of the Foundation, and the eagerness of the media and government officials to expose the Foundation's donors, many actual or prospective donors to the Foundation have expressed strong concern about possible disclosure of their donor status through Schedule B. ER197, 310–11; SER1088. At least one donor limited his contributions to avoid appearing on the Foundation's Schedule B. ER311, 335; SER527–30; SER1088.

Actual and potential donors have voiced particular fear of persecution if their affiliation with the Foundation became known to any "state government." ER306–08. That fear is magnified when it comes to the California Attorney General, which donors view as "a powerful partisan office." ER524–26; SER1104–05. California officials, including the Attorney General, have targeted the Freedom Partners Network in an effort to stamp out anonymous giving, which they

32

denigrate as "dark money." ER254–66; SER448–49. The Attorney General specifically accused "the Koch brothers" of engaging in a "brazen attempt to launder money through out-of-state shell organizations," SER756, and separately called to close the "loophole" that allows "certain groups to evade transparency by maintaining the anonymity of their donors," SER753. Despite later acknowledging that Charles Koch and David Koch had not laundered money as claimed, California never issued a retraction. ER262–66; SER450–51.

Donor fears about the Attorney General were corroborated and exacerbated by the conduct of this litigation. During depositions, counsel for the Attorney General repeatedly asked the Foundation's witnesses questions that have nothing to do with this lawsuit and seemed designed solely to harass, such as whether the witness believed President Obama was born in the United States, who the sister of Art Pope personally donated to, and whether the Foundation's sister organization had committed campaign-finance violations. ER17, 330, 475–76; 1851; SER20–71. The head of the Charitable Trusts Section, Tania Ibanez, testified that she now has concerns about the Foundation and its donors because they have invoked their First Amendment rights

via this suit:  "You're suing us . . . and you don't want to give us your Schedule B, so that has put my suspicions somewhat on alert. . . . I basically don't have any suspicions, per se, but the litigation causes me to have some concerns."  SER1073–74.

Concerns about disclosure have chilled contributions from past and potential donors.  The Foundation has already "left a lot of money . . . on the table" because of donors' fear of disclosure.  SER1108–09; *see also* ER306–08, 334, 337–38; SER1079, 1101–02, 1115–17.  Donors are especially "concerned about the repercussions of this case," given the potential disclosure of donor identities to the California Attorney General.  ER310; *see also* ER197.  This chill has particularly impacted the Foundation's activities in California.  ER1935–36.

Given these fears, it would "be devastating to our fundraising efforts," if the Foundation had to disclose its Schedule B to the Attorney General.  ER318.  Simply put, "[d]isclosure to the [R]egistry of this Schedule B information would chill contributions to the [F]oundation."  ER512–13; *see also* ER527–29.

## F.    Procedural History

On March 7, 2013, the Attorney General began sending the Foundation Schedule B delinquency letters.  ER1291; SER6, 445–47.  A year and a half later, the Attorney General warned the Foundation that, unless it submitted its 2011 and 2012 Schedule Bs within 30 days, California would (1) "disallow the tax exemption of the [Foundation]"; (2) impose late fees on "directors, trustees, officers, and return preparers," with these individuals "personally liable" for the fees; and (3) "suspend the [Foundation's] registration."  SER185–86; *see also* ER1051 (Attorney General "mean[t] it" when issuing these threats).

To protect itself, the Foundation sued seeking a preliminary injunction, which was granted on February 23, 2015.  SER72.  The Attorney General appealed to this Court, which, based on the preliminary-injunction record and on this Court's prior decision in *Center for Competitive Politics v. Harris* ("***CCP***"), 784 F.3d 1307 (9th Cir. 2015), vacated with instructions to enter a new injunction enjoining the Attorney General from publishing the Foundation's Schedule Bs. *AFPF*, 809 F.3d at 543.

A bench trial began on February 23, 2016, and concluded on March 4. On April 21, 2016, the district court issued an opinion permanently enjoining the Attorney General from requiring the Foundation to file its Schedule B as part of its periodic written report. ER1–12, published as *Americans for Prosperity Foundation v. Harris*, 182 F. Supp. 3d 1049 (C.D. Cal. 2016). Based on the trial record, the court found that the Attorney General had failed to establish that the Blanket Schedule B Submission Requirement advanced a governmental interest; moreover, any such interest could be achieved through alternative means less destructive of First Amendment rights. ER3–6. The court further found the Foundation demonstrated a reasonable probability that disclosing its Schedule B would subject its donors to threats, harassment, or reprisals, not least because of the Attorney General's inability to keep Schedule Bs confidential. ER6–10.

Based on these factual findings, the court held that the Blanket Schedule B Submission Requirement is unconstitutional as-applied to the Foundation. ER10–12. But the court declined to strike down the Blanket Schedule B Submission Requirement as facially

36

unconstitutional, reading this Court's decisions in *AFPF* and *CCP* as "foreclos[ing] any facial challenge."  ER6.

## SUMMARY OF THE ARGUMENT

The Attorney General's Blanket Schedule B Submission Requirement should be struck down as facially unconstitutional under the First Amendment.  The disclosure regime is illegitimate because it is not authorized by state law.  Bereft of authority to demand Schedule Bs, the Attorney General has imposed a *de facto* Schedule B submission requirement through ad hoc deficiency letters rather than through lawful regulation.

Even assuming the Attorney General has a legitimate or even heightened interest, the Blanket Schedule B Submission Requirement does not advance it.  The Attorney General virtually never (in fewer than 1% of investigations) uses Schedule Bs, in those rare circumstances when Schedule Bs are useful, the Attorney General can always obtain them through more targeted means, namely audit letters and subpoenas.  As the trial court found, the Attorney General was unable to establish even a single instance at trial in which pre-investigation collection of Schedule Bs accomplished anything good.

That 47 other states and the District of Columbia do not require submission of Schedule B confirms how far removed the document is from day-to-day policing of charities. On this record, the Attorney General lacks anything approaching the evidentiary showing she needs to satisfy the exacting scrutiny applicable to government demands for donor lists.

The Attorney General's pervasive, recurring pattern of inadvertently disclosing Schedule Bs further undermines the Blanket Schedule B Submission Requirement. These breaches of confidentiality chill contributions by donors who fear public exposure, especially those who contribute to controversial causes. Without serving any useful purpose, the Attorney General's blanket demand for Schedule Bs has resulted in countless confidentiality lapses that send shivers through the spines of charities and donors who prize their anonymity. Any such regime that casts chill to no good end is facially unconstitutional under the First Amendment.

The district court nevertheless felt bound by this Court's opinions in *CCP* and *AFPF*, which upheld the facial validity of the Blanket Schedule B Submission Requirement at the preliminary-injunction

phase based on an incomplete record.  It is black-letter law, however, that fact-based rulings made on preliminary records are not binding. Only once a rich trial record was amassed were the Attorney General's key assertions tested and debunked.  At that point, the district court erred as a matter of law in considering itself bound by preliminary rulings that had upheld the Attorney General's disclosure regime based on preliminary records.

At a minimum, the Blanket Schedule B Submission Requirement is unconstitutional as-applied to the Foundation, as the district court correctly ruled.  The Attorney General has failed to establish a particularized suspicion of the Foundation or other tailored justification for demanding the identities of the Foundation's  major donors nationwide.  And the Foundation proved at trial that its donors are chilled by the Attorney General's disclosure demand, given the reasonable probability that Foundation donors will be imperiled by disclosure of their identities to California.  The First Amendment calls for a permanent injunction protecting the Foundation and all charities against the Blanket Schedule B Submission Requirement.

## STANDARDS OF REVIEW

At issue are the district court's (1) legal conclusions, (2) factual findings, (3) evidentiary rulings, and (4) entry of an injunction. Different standards govern review of each.

***Legal Conclusions & Factual Findings***:  When a district court has ruled, following a bench trial, that the government violated the First Amendment, this Court reviews legal conclusions *de novo*, but defers to factual findings unless clearly erroneous.  *Lovell v. Poway Unified School District*, 90 F.3d 367, 370 (9th Cir. 1996); *Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir. 1988).  "'In applying the clearly erroneous standard to the findings of a district court sitting without a jury,'" this Court "'is not to decide factual issues *de novo*,' even where it is 'convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"  *Ibrahim v. U.S. Department of Homeland Security*, 835 F.3d 1048, 1058 (9th Cir. 2016) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)).  Provided "'the district court's account of the evidence is plausible in light of the record viewed in its entirety,'" this Court "must affirm."  *Id.*

***Evidentiary Rulings***:  This Court reviews evidentiary rulings for abuse of discretion.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014).  It also applies harmless error:  an erroneous evidentiary ruling does not justify reversal unless the losing party demonstrates that "the allegedly erroneous evidentiary ruling more probably than not was the cause of the result reached by the court."  *Jauregui v. City of Glendale*, 852 F.2d 1128, 1133 (9th Cir. 1988).

***Permanent Injunction***:  This Court also reviews the grant of a permanent injunction for abuse of discretion.  *Arizona Dream Act Coalition v. Brewer*, 818 F.3d 901, 908 (9th Cir. 2016).

## ARGUMENT

**I.    The Attorney General's Blanket Schedule B Submission Requirement Is Facially Unconstitutional**

### A.    Governing legal principles

#### 1.    Relevant First Amendment rights

Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble."  Implicit in these guarantees is the "right of expressive association," which is the right of individuals to band together to amplify their voices.  *Rumsfeld v. Forum for Academic and Institutional*

*Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 68 (2006) (citing *Boy Scouts of America v. Dale*, 530 U.S. 640, 647–48 (2000)).  Also implicit is the right to speak and associate anonymously.  *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 166–67 (2002); *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 199–200 (1999); *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 341–43 (1995); *Talley v. California*, 362 U.S. 60, 64–65 (1960); *ACLU v. Heller*, 378 F.3d 979 (9th Cir. 2004).

Weaving together these rights, the Supreme Court has repeatedly "held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity." *FAIR*, 547 U.S. at 69.  The leading example is *NAACP v. Alabama*, where the Court struck down the Alabama Attorney General's demand that the NAACP divulge the names of its members.  357 U.S. 449.  Similar decisions abound.  *E.g.*, *Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87 (1982); *Roberts v. Pollard*, 393 U.S. 14 (1968), *summarily affirming* 283 F. Supp. 248 (E.D. Ark. 1968) (three-judge court); *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963); *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961); *Shelton v. Tucker*, 364

U.S. 479 (1960); *Bates v. City of Little Rock*, 361 U.S. 516 (1960); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957).

Revealing a group's members exposes them to threats, harassment, and reprisals from those "opposed to the group or its objectives," and the "occurrence or apprehension of such reprisals tends to discourage the exercise of the rights which the Constitution protects." *Pollard*, 283 F. Supp. at 256. Given this "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association," the First Amendment protects against State demands for membership lists. *Gibson*, 372 U.S. at 557.

These constitutional safeguards for a group's *members* apply equally to its *donors*: "The right to join together 'for the advancement of beliefs and ideas,' is diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective.'" *Buckley v. Valeo*, 424 U.S. 1, 65–66 (1976) (quoting *NAACP v. Alabama*, 357 U.S. at 460). Donors are sufficiently integral that "[t]he First Amendment protects the right to engage in charitable solicitation." *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 611 (2003); *accord Riley v.*

*National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781,

787–89 (1988); *Village of Schaumburg v. Citizens for a Better

Environment*, 444 U.S. 620, 632–33 (1980).

### 2.      Exacting scrutiny

Given these First Amendment protections, a State can compel the

disclosure of a group's donors only upon satisfying "exacting scrutiny."

*Buckley*, 424 U.S. at 64.  This standard requires the State to prove that

(1) it has an "important" or "compelling" interest; (2) there is a

"substantial relation" between its interest and the information sought;

and (3) its means are "narrowly" drawn to avoid needlessly stifling

expressive association.

***Important or Compelling Interest***:  Under exacting scrutiny,

"the strength of the governmental interest must reflect the seriousness

of the actual burden on First Amendment rights."  *Davis v. FEC*, 554

U.S. 724, 744 (2008).  Compelled disclosure of a group's supporters

inherently burdens freedom of association and therefore "cannot be

justified by a mere showing of some legitimate governmental interest."

*Buckley*, 424 U.S. at 64.

Thus, to mandate disclosure of a group's supporters, the State must prove that its interest is "important," if not "compelling." *Compare, e.g.*, *Gibson*, 372 U.S. at 546 (requiring "compelling" interest), *Bates*, 361 U.S. at 524 (same), *and NAACP v. Alabama*, 357 U.S. at 463 (same), *with, e.g.*, *Doe v. Reed*, 561 U.S. 186, 196–99 (2010) (requiring "important" interest), *and Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 538 (9th Cir. 2015) (en banc) (same); *see also Dale*, 530 U.S. at 648 ("compelling state interests" needed to override right of expressive association); *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 98 (1974) (Marshall, J., dissenting) ("The First Amendment gives organizations such as the ACLU the right to maintain in confidence the names of those who belong or contribute to the organization, absent a compelling governmental interest requiring disclosure.").[2]

---

[2] The cases requiring only an "important interest" all appear in the electoral context, where the burden on First Amendment interests from compelled disclosure is "quite small." *Chula Vista*, 782 F.3d at 538. Outside of the electoral context, *every* Supreme Court case has required a "compelling" interest. Because this case falls outside the electoral context, the Attorney General should need to establish a *compelling* interest. Ultimately this issue appears academic, however, as the disputes in this case do not turn on whether the Attorney General's interests are "compelling" or merely "important." The

***Substantial Relation***:  The State must further "convincingly show a substantial relation" between the disclosure requirement and the governmental interest.  *Gibson*, 372 U.S. at 546; *Citizens United v. FEC*, 558 U.S. 310, 366 (2010).  The Supreme Court has ruled unconstitutional compelled disclosure of an organization's membership list when "there was no substantially relevant correlation between the governmental interest asserted and the State's effort to compel disclosure of the membership lists involved."  *Shelton*, 364 U.S. at 485 (citing *NAACP v. Alabama*, 357 U.S. 449; *Bates*, 361 U.S. 516).

***Narrow Tailoring***:  The "substantial relation" element requires, among other things, that the State employ means "narrowly drawn" to avoid needlessly stifling expressive association.  *Louisiana v. NAACP*, 366 U.S. at 296–97 (citations omitted); *accord Shelton*, 364 U.S. at 488; *Pollard*, 283 F. Supp. at 257, *affirmed*, 393 U.S. 14.

The Attorney General contends that the district court erred by examining whether the Schedule B Submission Requirement is "narrowly tailored" to achieve the State's interest.  AG Brief 44–45.

---

dispositive point is that the Attorney General must demonstrate more than a "mere showing of some legitimate governmental interest." *Buckley*, 424 U.S. at 64.

Remarkably, the Attorney General's brief fails to mention *Louisiana v. NAACP*, even though that case expressly holds that State demands for supporter lists must be "narrowly drawn" and the district court explicitly relied on it for this point. ER5. Nor does the Attorney General cite (let alone discuss) other binding decisions, such as *Shelton*, that hold the same. By ignoring these governing precedents, the Attorney General telegraphs that she has no answer for them.[3]

*Louisiana v. NAACP*, *Shelton*, and *Pollard* reflect a general principle: a State can *never* interfere with associational rights unless it uses means "closely drawn to avoid unnecessary abridgement of associational freedoms." *In re Primus*, 436 U.S. 412, 432 (1978) (quoting *Buckley*, 424 U.S. at 25); *accord, e.g.*, *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973) ("a State may not choose means that unnecessarily restrict constitutionally protected liberty"). "Precision of regulation" is the "touchstone" in First Amendment cases. *NAACP v. Button*, 371 U.S. 415, 438 (1963). Thus, as the Supreme Court recently explained,

---

[3] For support, the Attorney General misleadingly plucks out of context a line from *CCP*, 784 F.3d at 1312, that mentions an argument by the plaintiff about narrow tailoring. AG Brief 44–45. But the panel in *CCP* never addressed the plaintiff's argument on this point, never discussed narrow tailoring, and certainly never held that exacting scrutiny does not require narrow tailoring. *See* 784 F.3d at 1312–17.

"[e]ven when the Court is not applying strict scrutiny, we still require a fit that . . . employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456–57 (2014) (plurality opinion; citation and quotation marks omitted).

*McCutcheon* gives the lie to another argument by the Attorney General: that the district court erroneously imposed a "least restrictive means requirement" in violation of this Court's recent pronouncements that "exacting scrutiny is not a least-restrictive-means test." AG Brief 45–46 (quoting *AFPF*, 809 F.3d at 541, and *Chula Vista*, 782 F.3d at 541). As *McCutcheon* shows, this argument conflates "least restrictive means" with "narrow tailoring." The former requires a perfect fit (hence the superlative "least" rather than "less"), whereas the latter requires only a substantial fit ("narrow" not "narrowest"). *McCutcheon*, 134 S. Ct. at 1456–57. Here, the district court did *not* impose a "least restrictive means" requirement; it held only that the Blanket Schedule B Submission Requirement is poorly tailored because the Attorney General's aims "can be more narrowly achieved," ER4–6, which is the exact standard the Supreme Court applied in *Louisiana v. NAACP*, 366

48

U.S. at 296, and *Shelton*, 364 U.S. at 488. Thus, the district court's insistence on narrow tailoring both follows Supreme Court precedent and comports with this Court's statements that "exacting scrutiny is not a least-restrictive-means test." *Chula Vista*, 782 F.3d at 541.[4]

### 3. Facial challenge

A law is facially unconstitutional under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). Thus, the facial validity of the Blanket Schedule B Submission Requirement depends on

---

[4] Even though the district court did not apply a least-restrictive-means test, it would have been correct to do so. The district court well explained that this Court's holding in *Chula Vista*—that "exacting scrutiny is not a least-restrictive-means test"—is "properly limited to the electoral context." ER5. The unique governmental interests in election cases presumptively make disclosure requirements "the least restrictive means." *Buckley*, 424 U.S. at 68. But in nonelectoral cases, the governmental interests are starkly different, *see AFPF*, 809 F.3d at 538, so the presumption falls away. That is why in numerous nonelectoral cases—which *Chula Vista* neither discussed nor purported to overrule—this Court has repeatedly held that a State can impose a disclosure requirement only if it is the "'least restrictive means' of obtaining the desired information." *Brock v. Local 375, Plumbers International Union*, 860 F.2d 346, 350 (9th Cir. 1988) (quoting *Buckley*, 424 U.S. at 68); *accord Perry v. Schwarzenegger*, 591 F.3d 1147, 1161 (9th Cir. 2010); *Dole v. Service Employees Union*, 950 F.2d 1456, 1461–62 & n.3 (9th Cir. 1991).

whether a substantial number of its applications survive exacting scrutiny, judged in related to its plainly legitimate sweep. *See Doe v. Reed*, 561 U.S. at 194, 197–201.

**B.    The Blanket Schedule B Submission Requirement fails exacting scrutiny**

**1.    Lack of a legitimate interest**

The Attorney General lacks even a legitimate interest in the Blanket Schedule B Submission Requirement. California's Uniform Supervision of Trustees for Charitable Purposes Act, Cal. Gov. Code §§ 12580–12599.8, governs the Attorney General's regulations of charities. Among other things, this Act specifies limited circumstances in which the Attorney General can demand the names and addresses of donors. For example, the Attorney General can demand "the names and mailing address of each contributor" who makes a noncash donation to a commercial fundraiser in response to a solicitation campaign. § 12599.7(a)(1). In contrast, no provision authorizes the Attorney General to impose an *across-the-board* requirement that all charities submit the names and addresses of their major donors on an annual basis when renewing their registrations.

The Attorney General maintains that the Blanket Schedule B Submission Requirement is a proper exercise of authority under § 12586, which requires charities to submit periodic written reports as part of their registration renewal. SER185–86, 201–06, 434–44; ER636, 756, 770–71. But § 12586(a) specifies that a periodic written report is limited to covering "information as to the nature of the assets held for charitable purposes and the administration thereof." Unlike § 12599.7(a)(1), nothing in § 12586 expressly authorizes the Attorney General to demand *donors' names and addresses*. A legislature's decision to include language in one section of a statute but omit it from a neighboring section is intentional. *Pacific Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 687–88 (2012); *Red Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1089–90 (9th Cir. 2011); *Gikas v. Zolin*, 863 P.2d 745, 752 (Cal. 1993). By intentionally restricting § 12586 to cover only the "nature" or "administration" of charitable assets—and not the "name and mailing address" of the donors of those assets—California's legislature has foreclosed the Attorney General from demanding Schedule B under § 12586. Lacking legal authority, the Attorney General resorted to creating a *de facto* Schedule B

submission requirement through ad hoc deficiency letters rather than through lawful regulation.  *See* pages 9–11, *supra.*

Even assuming *arguendo* that the Attorney General might have authority under § 12586, however, the Attorney General has not properly exercised that power.  Section 12586(b) authorizes the Attorney General to specify the contents of periodic written reports only through "rules and regulations."  The Attorney General has not issued any rule or regulation requiring charities to file Schedule B.  ER621, 634–36, 771; SER1024; *see also* pages 8–9, *supra.*

The Attorney General nonetheless insists that "California law requires" submission of "Form 990 and all schedules and attachments," AG Brief 7, and points to the instructions for the RRF-1.  But those instructions state that charities must file "Form 990 . . . and attachments"—*not* "*all schedules* and attachments."  ER1129. Attachments differ from schedules:  "*attachments*" include things like a "name change amendment," a "list of subordinate organizations included in a group return," and "articles of merger or dissolution," whereas "*schedules*" are specific pre-existing forms, like Schedule A, that an organization may need to complete with Form 990.  IRS,

Instructions for Form 990, at 8 (2016), https://www.irs.gov/pub/irs-pdf/i990.pdf (distinguishing between the "Core" Form 990, "Schedules," and "Attachments"). An instruction to submit Form 990 and "attachments" is therefore not an instruction—let alone a rule or regulation—to submit Schedule B. *See* SER452, 468, 478, 484 (directing charities to withhold Schedule B when a State requests "Form 990 . . . and attachments" but does not specifically request "Schedule B").

Disclosure demands that exceed statutory authority are illegitimate. *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 388–97 (D.C. Cir. 1981) (vacating order enforcing subpoena that would intrude on associational rights because FEC lacked statutory authority to issue subpoena). The Attorney General thus lacks even a legitimate interest—let alone an important or compelling interest—in the Blanket Schedule B Submission Requirement.

### 2. Lack of substantial relation

Even assuming *arguendo* that the Attorney General's purported law-enforcement interests are legitimate and heightened, *see* AG Brief 47, the Blanket Schedule B Submission Requirement is not

substantially related to those interests.  As the district court found, the

Blanket Schedule B Submission Requirement serves no purpose:  The

Registry never uses Schedule Bs; the Investigative Unit "virtually

never" uses Schedule Bs; and even in the rare instances when a

Schedule B is of some use, the Attorney General can always obtain the

relevant information through means short of a dragnet demand that all

charities submit Schedule B every year.  ER3–6, 11.

These factual findings are resoundingly supported by the record.

*See* pages 11–16, *supra*.  The Attorney General has never used Schedule

B to launch an investigation or to obviate an investigation.  ER976–77,

1028, 1060; SER995. Only five of the Attorney General's 540

investigation of charities over the past ten years so much as implicated

a Schedule B.  ER4, 982.  In other words, the Attorney General uses

Schedule B in one investigation every two years, or about 0.92% of

investigations.  Even in these five investigations, the investigators were

able to obtain the pertinent Schedule B information from other sources.

ER4, 979, 983, 990–91.  A demand that *tens of thousands* of charities

submit confidential donor information *each year* just to facilitate a mere

*five* investigations over *ten years* does not by any stretch of the

imagination "substantially relate" to a governmental interest—

especially when all of the relevant information is available from other

sources. ER3–6. "The strong associational interest in maintaining the

privacy of membership lists of groups engaged in the constitutionally

protected free trade in ideas and beliefs may not be substantially

infringed upon such a slender showing as here made by the [Attorney

General]." *Gibson*, 372 U.S. at 555–56; *accord Bates*, 361 U.S. at 525–

27; *NAACP v. Alabama*, 357 U.S. at 463–66; *Acorn Investments, Inc. v.

City of Seattle*, 887 F.2d 219, 225–26 (9th Cir. 1989).

Evidence from other states confirms the point. Forty-seven other

states and the District of Columbia do not require charities to file

Schedule B. *See* ADD-35 to ADD-43 (50-State Survey on Schedule B

Requirements). Moreover, the three states that have adopted the same

uniform statute that California adopted for regulating charities—

Illinois, Michigan, and Oregon[5]—all expressly tell charities *not* to file

Schedule B. *See* ADD-37, ADD-38, ADD-41. So does the IRS. *E.g.*

SER452, 468, 478, 484. If Schedule B were essential to preventing

---

[5]  *See* Marion R. Fremont Smith, *Governing Nonprofit Organizations: Federal and State Law* 312–13 (2004) (describing the uniform statute).

fraud or illegality by charities, then California would have much better company in demanding it. Likewise, California would have been more attentive to collecting it throughout all the years, rather than overlooking the absence of tens of thousands of Schedule Bs for nearly a decade before first realizing any were missing. ER2–4, 374–80.

The lack of a substantial relation is compounded by the Attorney General's cavalier disregard of Schedule B confidentiality. *See* pages 16–24, *supra*. The record evidence of the Attorney General's lapses is not only reflected in the district court's findings but overwhelming—too vast to chronicle fully herein. To summarize, the Registry has posted on its website over 1778 Schedule Bs, thereby exposing to the public the names and addresses of thousands of donors, including for controversial charities such as Planned Parenthood. ER9, 383–88, 816–17, 1003, 1043, 1139–40, 1292–325, 1349–53; SER187–200, 207–93, 402–33, 971–75. Separately, the Registry made all 350,000 of its confidential documents—including Schedule Bs—accessible to anyone with a web browser. ER390–92, 866, 937, 1035–36. The district court thus had ironclad basis to find that "[t]he pervasive, recurring pattern of uncontained Schedule B disclosures—a pattern that has persisted even

during this trial—is irreconcilable with the Attorney General's assurances and contentions as to the confidentiality of Schedule Bs collected by the Registry." ER9.

Part and parcel of these pervasive lapses, the Attorney General has failed to take rudimentary measures to guard against and remedy them. Students and interns are entrusted with separating confidential materials by hand from tens of thousands of filings each year. ER795–96. Technological checks are disregarded. ER605–06, 630–31, 817–18, 851, 873–78, 920–23. Protocols and training for controlling access are absent. ER924–26; SER985. No employee has been disciplined for a breach. ER763, 813–14, 918–19, 945; SER1070. No breach has been reported to any charity, donor, or anyone else outside of the Attorney General's office. ER631–32, 765–66, 819–21, 915, 946, 951, 1039, 1053. The lone regulation that has been adopted (post-judgment) disavowed any change or improvement in any of these respects. ER795–96, 921–25; SER490.[6] The head of the Charitable Trusts Section does not even

---

[6] The Attorney General stresses that these new regulatory amendments, promulgated in July 2016 in response to this litigation, now prohibit the disclosure of Schedule B. AG Brief 58–59. But these regulatory amendments merely "codify" the Attorney General's longstanding approach to confidentiality without making any

consider the posting of Schedule Bs on the Registry's website to be a breach of confidentiality.  ER1033–34.  And she affirmatively embraces calculated disclosure of "confidential" Schedule Bs to a litany of external parties that are themselves subject to no restrictions whatsoever.  ER1053–56.

In sum, the current Registrar was quite right to "concede[] that the Registry has more work to do before it can get a handle on maintaining confidentiality," ER9 (citing ER921), just as the district court was right to find that "the Attorney General's current approach to confidentiality obviously and profoundly risks disclosure of any Schedule B the Registry may obtain[.]"  ER10.[7]  This profound risk of disclosure chills contributions by all donors who wish to remain

improvements.  SER490.  The regulation thus does nothing to fix the deficiencies found below.  If the Attorney General nonetheless contends that the facts on the ground have changed, then her proper course would be to make a new factual record and move the district court to revise the permanent injunction pursuant to Federal Rule of Civil Procedure 60(b)(5).  *See Horne v. Flores*, 557 U.S. 433 (2009).

[7]  The Attorney General's disregard of confidentiality apparently extends beyond this case.  Recently, the Attorney General confessed disclosing the personal information of 3400 gun-safety instructors in response to a Public Records Act request.  *See* Perry Chiaramonte, *California snafu releases personal info of nearly 4,000 gun safety instructors*, Fox News (Jan. 18, 2017), http://www.foxnews.com/us/2017/01/18/california-snafu-releases-personal-info-nearly-4000-gun-safety-instructors.html.

anonymous.  ER513, 626–27; *see Perry*, 591 F.3d at 1163–65 (government actions that create fear of disclosure cause a chilling effect that the First Amendment protects against); *Dole*, 950 F.2d at 1460–61 (same); *see also McIntyre*, 514 U.S. at 341–43 (describing the many reasons why individuals desire anonymity and are chilled from exercising First Amendment freedoms when it is unavailable).

### 3. Lack of narrow tailoring

The lack of a substantial relation to a governmental interest is further highlighted by the excessive breadth of the Blanket Schedule B Submission Requirement.  In the extremely rare case where a Schedule B might be useful, the Attorney General's investigators can obtain that Schedule B just by following the standard practice of issuing audit letters or subpoenas.  *See* pages 13–14, *supra.*  There is no reason to demand, collect, process, and store tens of thousands of Schedule Bs each year—with the concomitant risk of inadvertently disclosing these Schedule Bs to the public—while the handful of relevant Schedule Bs remain available on an as-needed basis in the one case every two years to which they may actually matter.

Indeed, the Attorney General was unable at trial to establish a *single* concrete instance where the pre-investigation collection of Schedule Bs served any function. In the two investigations the Attorney General focused on, the Schedule Bs were either already publicly available (in the case of L.B. Research) or were acquired through targeted subpoenas (in the case of Cancer Fund of America). *See* pages 14–16, *supra*. That is why the district court found that "[t]he record before the Court lacks even a single, concrete instance in which pre-investigation collection of a Schedule B did anything to advance the Attorney General's investigative, regulatory or enforcement efforts." ER6.

The Attorney General "cannot" demand disclosure of donors via "means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Louisiana v. NAACP*, 366 U.S. at 296 (quoting *Shelton*, 364 U.S. at 488); *accord Pollard*, 283 F. Supp. at 257, *affirmed*, 393 U.S. 14. Targeted audit letters and subpoenas achieve the Attorney General's aims of investigating charitable fraud without stifling the associational rights of legions of organizations and donors that are not under investigation and never will be. Ready availability

of these obvious alternatives establishes that the Blanket Schedule B Submission Requirement is dismally tailored and therefore unconstitutional under *Louisiana v. NAACP*, *Shelton*, and *Pollard*. *See also Schaumburg*, 444 U.S. at 637–38 (government can regulate charitable solicitation only through "narrowly drawn regulations designed to serve [governmental] interests without unnecessarily interfering with First Amendment freedoms"); *Porter v. Bowen*, 496 F.3d 1009, 1024 (9th Cir. 2007) ("it was the Secretary's burden to show that the potential types of fraud the Secretary suggests might occur could not have been halted through measures less burdensome").

The Attorney General rejoins that audit letters and subpoenas are "not as effective or efficient." AG Brief 54. The record shows otherwise. Given that the Attorney General failed to establish a single instance where pre-investigation collection of Schedule B served any function, it follows that the Blanket Schedule B Submission Requirement is neither effective nor efficient. ER3–4, 6. Moreover, the Investigative Unit routinely requests documents through audit letters, ER987–89, 997–98, and no audit letter or subpoena requesting a Schedule B *ever* "frustrated or undermined the ensuing investigation or audit." ER1029;

61

*see also* ER988–89; SER982.  It is therefore no less effective or efficient to use audit letters and subpoenas to obtain Schedule Bs.

In any event, as a matter of law, efficiency alone cannot trump the First Amendment.  As the Supreme Court explained when striking down one state's effort to regulate charities in a manner that purportedly furthered efficiency while intruding on First Amendment rights:  "we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency." *Riley*, 487 U.S. at 795.

*    *    *

In sum, the record reflects that the Attorney General lacks a legitimate interest but nonetheless demands that tens of thousands of charities annually file Schedule Bs just to facilitate review of a tiny handful.  The remaining 99.99% never serve any useful purpose.  At best, they gather dust; at worst, they are publicly disclosed.  The number of Schedule Bs the Registry has made publicly accessible through its website is orders of magnitude higher than the number the Attorney General has used.  Even in the vanishingly rare case where Schedule Bs may be relevant, the Attorney General can obtain them

through targeted audit letters and subpoenas. Thus, the Attorney General's sweeping disclosure chills countless donors by creating a profound yet gratuitous risk of exposure. If "exacting scrutiny" is to mean anything, then such a policy cannot stand consistent with the First Amendment. The Blanket Schedule B Submission Requirement is patently unconstitutional, incapable of satisfying exacting scrutiny in any of its applications. *Stevens*, 559 U.S. at 473.

### C. The district court erred in ruling that this Court's prior decisions preclude a facial challenge

In light of the above, the district court concluded that the Attorney General had failed "to convincingly show that its demands are substantially related to a compelling interest, including by being narrowly tailored to achieve that interest." ER6. Nevertheless, the court ruled that it "cannot find such a disclosure requirement facially invalid," ER6, because of this Court's holdings in *CCP* and *AFPF* that the disclosure regime "was not facially unconstitutional." ER2.

This ruling was erroneous. Both *CCP* and *AFPF* were decided at the preliminary-injunction phase. *CCP*, 784 F.3d at 1310; *AFPF*, 809 F.3d at 538. Of course, "decisions on preliminary injunctions 'are not binding at trial on the merits'" on any questions of fact or mixed

63

questions of fact and law; they are binding only on pure issues of law as to which the facts are irrelevant. *Southern Oregon Barter Fair v. Jackson County*, 372 F.3d 1128, 1136 (9th Cir. 2004) (citation omitted); *accord Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090–91 (9th Cir. 2013); *see also California First Amendment Coalition v. Woodford*, 299 F.3d 868, 879–80 (9th Cir. 2002). Whether a law substantially relates to a governmental interest is a fact-bound issue. *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion); *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 961–62 (9th Cir. 2009), *affirmed*, 564 U.S. 786 (2011); *see also Erie v. Pap's A.M.*, 529 U.S. 277, 310–14 (2000) (Souter, J., concurring) (collecting cases). Accordingly, this Court's rulings upholding the facial validity of the Blanket Schedule B Submission Requirement based on a preliminary-injunction record were, as a matter of law, not binding on the district court once it compiled a trial record.

The district court's error is all the more consequential because *CCP* and *AFPF* were predicated on numerous factual assumptions that

may have appeared sound at the preliminary-injunction phase but proved false at trial[8]:

*Authority*:  In *CCP*, the panel concluded that the Blanket Schedule B Submission Requirement was a legitimate exercise of the Attorney General's "subpoena power."  784 F.3d at 1317.  At trial, however, the Attorney General's witnesses conceded that the disclosure requirement was *not* an exercise of the subpoena power.  ER663–67.  Instead, it is *solely* a purported exercise of the power under Cal. Gov. Code § 12586 to specify the contents of periodic written reports.  *See* SER185–86, 201–06, 434–44; ER636, 756, 770–71.  Yet, as explained *supra* (pages 50–53), the Attorney General cannot lawfully demand Schedule Bs under § 12586.

*Usefulness*:  The panel in *CCP* further relied on the Attorney General's then-unrebutted evidence that "having immediate access to Form 990 Schedule B increases her investigative efficiency, and that reviewing significant donor information can flag suspicious activity."  784 F.3d at 1317.  Trial in this case disproved that, too.  The record now

---

[8]  *AFPF* upheld the facial validity of the disclosure regime based solely on *CCP*, *see* 809 F.3d at 538, so the same factual revelations that undercut *CCP* also undercut *AFPF*.

demonstrates that the Blanket Schedule B Submission Requirement does not increase the Attorney General's investigative efficiency (Schedule Bs are relevant in only 0.92% of investigations, and investigators do not rely on Schedule Bs already in the Registry's possession); does not result in suspicious activity being flagged (Schedule Bs are not reviewed until a complaint arrives); and does not serve any function that cannot be achieved through alternative, less-restrictive means (namely, targeted audit letters and subpoenas). *See* pages 11–16, 53–63, *supra.*

***Confidentiality***: Finally, the panel in *CCP* deemed it "speculative" that the Attorney General might inadvertently release Schedule Bs to the public. 784 F.3d at 1316. This finding was based on representations the Attorney General made to this Court that do not square with the known facts. In July 2014, the Attorney General submitted a brief asserting that "the fact remains that [Schedule B] information *is* kept confidential, and there is no evidence to suggest that any 'inadvertent disclosure' has occurred or will occur." Answering

Brief, *CCP*, No. 14-15978, ECF 17-1, at 32–33 (9th Cir. July 8, 2014).[9] At trial, the evidence established that, as early as July 2012, the Attorney General knew of Schedule Bs disclosed through the Registry's website. ER596–97, 768–70, 802–09, 816–817, 1003, 1043, 1139–40, 1354–57; SER187–200, 407–09, 430–33. The Attorney General's witnesses thus conceded at trial that the statements in the brief to this Court in *CCP* were "not accurate." ER634, 1042–46. Moreover, trial established that the Registry had made accessible online *all* of the Schedule Bs it kept as confidential and had affirmatively published over 1778 confidential Schedule Bs on its website. *See* pages 16–22, *supra.*

These revelations highlight why the decisions in *CCP* and *AFPF* "on preliminary injunctions are just that—preliminary," and are not "binding." *Southern Oregon*, 372 F.3d at 1136. Just like in *Southern Oregon*, the presence of a full record calls for "reexamining the merits of the facial challenge" previously decided on an incomplete record at the preliminary-injunction phase. *Id.* For the reasons explained above, it is clear from the trial record and governing law that the Blanket Schedule B Submission Requirement is facially unconstitutional.

---

[9] The Attorney General has repeated this misrepresentation in other briefs to this Court. *See* pages 16–17, *supra.*

## II. The Blanket Schedule B Submission Requirement Is Unconstitutional As Applied to the Foundation

The points described above—the lack of a legitimate interest, the lack of a substantial relation, and the lack of narrow tailoring—render the Blanket Schedule B Submission Requirement not only facially unconstitutional but also unconstitutional as-applied to the Foundation. *See* pages 50–63, *supra*. The Attorney General's lack of need for the Foundation's Schedule Bs and the particular threats and chilling effect the Foundation's donors face make clear that the Requirement should be struck down at least on an as-applied basis.

### A. Demanding the Foundation's Schedule B is not substantially related to a governmental interest

To establish the "substantial relationship" needed to satisfy exacting scrutiny in an as-applied challenge, the Attorney General must supply a justification for the disclosure requirement tailored to the *specific* organization at issue. *Gibson*, 372 U.S. at 551–58; *Bates*, 361 U.S. at 525–27; *NAACP v. Alabama*, 357 U.S. at 464–65; *see also Madigan*, 538 U.S. at 617–23.

Before issuing ad hoc Schedule B deficiency letters to the Foundation in 2013, the Attorney General did not allege or even suspect

the Foundation was engaging in any wrongdoing whatsoever. ER1020–21; SER1073–74. Because demanding the Foundation's donor information does not further any specific governmental purpose, the Blanket Schedule B Submission Requirement is unconstitutional as-applied to the Foundation. *See Gibson*, 372 U.S. at 554–58; *Bates*, 361 U.S. at 525–27; *NAACP v. Alabama*, 357 U.S. at 464–65; *Pollard*, 283 F. Supp. at 258, *affirmed*, 393 U.S. 14; *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 119–20 (3d Cir. 1987).

## B. Disclosing Schedule B to the Attorney General would expose the Foundation and its donors to a reasonable probability of threats, harassment, and reprisals

Furthermore, as the district court found as a matter of fact, there is a "reasonable probability" that compelled disclosures of Schedule B would subject the Foundation's donors to threats, harassment, or reprisals, thereby warranting as-applied relief. ER6–8 (quoting *CCP*, 784 F.3d at 1317).

When it comes to identifying a reasonable probability of threats and harassment, the Supreme Court has "rejected . . . 'unduly strict requirements of proof' in favor of 'flexibility in the proof of injury.'" *Brown*, 459 U.S. at 101 n.20 (quoting *Buckley*, 424 U.S. at 74). It

suffices for an organization to submit "specific evidence of past or present harassment of members due to their associational ties." *Buckley*, 424 U.S. at 74. An organization can also rely on "evidence of the experiences of other chapters espousing the same political philosophy." *Brown*, 459 U.S. at 101 n.20.

At trial, the district court found that the Foundation had submitted "ample evidence establishing that [the Foundation], its employees, supporters and donors face public threats, harassment, intimidation, and retaliation once their support for and affiliation with the organization becomes publicly known." ER7. The record bears this out. As detailed at length *supra* (pages 28–31), the Foundation and its affiliates have been subjected to horrific death threats, bomb threats, cyberattacks, violent protests, boycotts, and numerous other types of threats, harassment, and reprisals. FBI investigations into credible death threats are not light affairs; a swarming mob collapsing an occupied tent with box knives is not an idle threat. ER205–07, 269–271; SER551.

The trial court also found that submission of the Foundation's Schedule B to the Attorney General "obviously and profoundly" risks

public disclosure given the Registry's inability to keep Schedule Bs confidential. ER10. That specter looms large because the media and politicians are ravenous about exposing the Foundation's donors. *See* pages 27–28, *supra*. Indeed, a news outlet recently published two Schedule Bs of the Foundation that were inadvertently disclosed on a state attorney general's website, even though the Schedule Bs were over a decade old at the time. SER554–57; ER199–200. Submitting the Foundation's Schedule B to the Attorney General would thus "be devastating" to the Foundation's overall fundraising efforts, ER318, as it would "chill contributions to the [F]oundation," ER512–13, especially contributions by Schedule B donors who fear the risk of the Foundation's Schedule B becoming public and triggering threats, harassment, and reprisals like those encountered by other known affiliates of the Foundation. *See* pages 28–34, *supra*. These facts well support the district court's ruling that the Blanket Schedule B Submission Requirement is unconstitutional as-applied. ER6–12.

### C. The Attorney General's counterarguments ignore the proper scope of First Amendment protections

The Attorney General rejoins with a series of arguments that have been rejected by the Supreme Court and by this Court as incompatible with First Amendment protections.

The Attorney General first argues that the district court applied "the wrong standard of proof" because it (1) "did not require the Foundation to make a preliminary showing of harm" and (2) it did not require the Foundation to "show a reasonable probability of injury to its donors *arising from* the Schedule B requirement." AG Brief 27. Neither of these arguments is sound. The Attorney General seems to be suggesting that no aggrieved organization can ever protect itself and its donors against chill—instead, they would need first to suffer the chill, then complain of it afterwards. Thankfully, no court has ever so held, and the First Amendment has never so required.

The Supreme Court made clear in *Doe v. Reed* that no preliminary showing of harm is necessary. There, the Court analyzed a mandatory disclosure requirement by first examining whether it was "substantially related" to the government's interests. 561 U.S. at 197–99. Only *after* determining that there *was* a substantial relation did the Court *then*

consider whether there was a sufficient probability of threats and harassment from disclosure to render the disclosure requirement unconstitutional. *Id.* at 199–202; *see also Pollard*, 283 F. Supp. at 258, *affirmed*, 393 U.S. 14 (striking down disclosure requirement despite absence of record evidence of any harm).

Nor must an organization show harm "arising from" the challenged disclosure requirement. In *Brown* and *Buckley*, the Supreme Court expressly "rejected" the requirement that an organization "prove that 'chill and harassment [are] directly attributable to the specific disclosure from which the exemption is sought.'" *Brown*, 459 U.S. at 101 n.20 (quoting *Buckley*, 424 U.S. at 74). In any event, the Foundation did demonstrate that the Blanket Schedule B Submission Requirement directly chills donors, who fear the risk that the Attorney General would publicly disclose the Foundation's Schedule B and also the hostility evinced by the Attorney General and her fellow officials in California. *See* ER9–10; pages 31–34, *supra*.

Nor is there any merit in the Attorney General's effort to trivialize the number of donors listed on one of the Foundation's Schedule Bs. AG Brief 13–14. For one thing, the record establishes that compromising

the identity of any donor would cast a chill over all donors.  ER513,

527–28, 626–27.  Beyond that, the record establishes that loss of a

single Schedule B donor would be especially damaging given both the

large levels at which these individuals donate and the ripple effect that

would ensue.  ER201, 311, 318, 335.  Finally, because the operative

inquiry involves *balancing* the claimed regulatory interest against the

threatened chill, the Attorney General's attempt to discount the number

of Schedule B donors would at best be a push—for the information the

Attorney General hopes to glean from any particular Schedule B

extends no further than the number of donors listed thereon.

Next, the Attorney General claims that *Buckley*'s relaxed standard

of proof—which includes the reasonable-probability-of-threats test, 424

U.S. at 74—applies only to "new" and "minor" political parties.  AG

Brief 28–30.  But this argument disregards the Supreme Court's

instruction that *any* organization may successfully resist mandatory

disclosure upon showing a reasonable probability of threats.  *Citizens*

*United*, 558 U.S. at 370; *McConnell v. FEC*, 540 U.S. 93, 198–99 (2003).

More fundamentally, it disregards the axiom that *all* speakers—

irrespective of their identity, size, or wealth—enjoy the same rights to

free expression and free association. *Citizens United*, 558 U.S. at 340–41, 349–50; *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978). As the Supreme Court declared in *Gibson*, the First Amendment protects "the privacy of membership lists" of "*all* legitimate organizations." 372 U.S. at 555–56 (emphasis added); *accord, e.g.*, *Pollard*, 283 F. Supp. at 258, *affirmed*, 393 U.S. 14 (protecting a membership list of the Republican party, even though it is neither "new" nor "minor").

The Attorney General then contends that the Foundation has not submitted *enough* proof that there is a reasonable probability of threats, harassment, and reprisals, or other chilling effect on donors. AG Brief 30–43. The district court found otherwise, however, and the wealth of evidence discussed *supra* (pages 28–34, 69–71) establishes that this factual finding is far from clearly erroneous. This Court cannot reconsider the issue *de novo* or overturn the district court's findings even if it might have weighed the evidence differently. *Ibrahim*, 835 F.3d at 1058.

Moreover, the bar for demonstrating a sufficient chilling effect to prevail on a First Amendment challenge is not high. As this Court held

in *Dole*, a demand that a union disclose its meeting minutes ran afoul of the First Amendment simply because it would have caused two union members to skip meetings. 950 F.2d at 1460. The evidence of death threats, violent protests, and other harassment in this case—and the subsequent chilling effect on contributions—goes well beyond the chilling effect that was held sufficient in *Dole*.

The Attorney General appears to believe that "substantial uncontroverted evidence" of murder, lynching, arson, or fire-bombs is necessary, pointing to cases involving horrific violence where the Supreme Court struck down disclosure requirements, such as *NAACP v. Alabama*, 357 U.S. 449, and *Brown*, 459 U.S. 87. AG Brief 39–40. That position is perverse as well as wrong. Although evidence of ghastly violence is *sufficient* to establish a reasonable probability of threats, harassment, or reprisals, it is not *necessary*, as *Dole* makes clear. *Accord, e.g.*, *Pollard*, 283 F. Supp. at 258, *affirmed*, 393 U.S. 14 (striking down disclosure requirement despite absence of record evidence showing any concrete harm); *Local 1814, International Longshoreman's Ass'n v. Waterfront Commission of New York Harbor*, 667 F.2d 267, 271–72 (2d Cir. 1981) (same); *Fraternal Order of Police*,

812 F.2d at 119–20; *Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1118 (D.C. Cir. 1978) (en banc) (same); *Boorda v. Subversive Activities Control Board*, 421 F.2d 1142, 1148 & n.20 (D.C. Cir. 1969) (same).

The Attorney General is out of line to insist that the Foundation produce corpses before invoking its First Amendment rights. Many Supreme Court and Circuit Court opinions confirm that the evidentiary standard is simply a "reasonable probability" of threats, harassment, or reprisals—nothing more. *E.g.*, *Citizens United*, 558 U.S. at 370; *CCP*, 784 F.3d at 1317. The district court got things right: even if the death threats and other "abuses" in the present case "are not as violent or pervasive as those encountered in *NAACP v. Alabama* or other cases from that era, this Court is not prepared to wait until [a Foundation] opponent carries out one of the numerous death threats made against its members." ER8; *accord Perry*, 591 F.3d at 1164 ("chilling effect" caused by governmental action need not be as "serious" as that in *NAACP v. Alabama* for the action to violate the First Amendment).

**D. The district court's evidentiary rulings were within its sound discretion**

**1. Admission of evidence**

The Attorney General complains (AG Brief 36–37 & n.6) that the district court should have prohibited, as hearsay, testimony by Foundation employees about their interactions with donors who fear disclosure. *See* ER211, 248–49, 305–07, 337, 472–73. But testimony by "officials of the organization" that donors had expressed fear "of having their identity revealed" is not hearsay when used to prove that the organization's "fund raising efforts . . . were being interfered with." *United States Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1265 (D.C. Cir. 1973), *reversed on other grounds*, 421 U.S. 491 (1975).

Moreover, even if hearsay, such testimony is admissible under the state-of-mind exception. A donor's statement that she intends to stop donating because of fear of disclosure demonstrates the donor's "emotional . . . condition" and "motive" or "intent." Fed. R. Evid. 803(3). Federal district courts routinely admit out-of-court statements about a declarant's fear, particularly where "chilling" of associational rights is at issue. *E.g., Garcia v. Green Fleet Systems, LLC*, 2014 WL 5343814, at *24 (C.D. Cal. Oct. 10, 2014); *Hirsch v. Corban Corporations, Inc.*,

949 F. Supp. 296, 303–04 (E.D. Pa. 1996); *Lightner v. Dauman Pallet, Inc.*, 823 F. Supp. 249, 252 n.2 (D.N.J. 1992).  By no means did the court below abuse its discretion in ruling that the challenged testimony falls "under the state of mind exception" because it goes to a donor's "contemporaneous plan or intent to no longer donate."  ER18; *see Wagner v. County of Maricopa*, 747 F.3d 1048, 1053 (9th Cir. 2013).  Moreover, given the other extensive record evidence establishing the threats and chilling effect the Foundation and its affiliates face, any error in admitting this testimony would be harmless and no basis for overturning the judgment, *Jauregui*, 852 F.2d at 1133.

### 2.   Exclusion of evidence

Next, the Attorney General complains (AG Brief 49 n.11) that the district court barred Steve Bauman from testifying about investigations involving Schedule B as to which he lacked personal knowledge.  *See* ER972–75.  But the law is clear that a witness cannot testify when he lacks "personal knowledge of the matter," Federal Rule of Evidence 602, nor can the witness "fill[] the gaps in [his] memory with hearsay," *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015).  Excluding this testimony was well within the court's discretion.

The Attorney General further complains (AG Brief 49 n.11) that the district court barred evidence of one investigation that purportedly used Schedule B because the Attorney General was unable or unwilling to provide identifying details. ER1014–15.[10] In discovery, the Attorney General invoked privilege to refuse to identify *any* investigation that purportedly used Schedule B. SER1132–1136. It is well established that a party cannot use privilege as a shield to prevent discovery and then rely upon the withheld information to prove a defense. *Chevron Corp. v. Penzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). It was only proper, therefore, to exclude evidence of an investigation that the Attorney General had blocked discovery into. ER1014–15.

In any event, these evidentiary rulings were harmless. It is undisputed that the Attorney General used Schedule B in no more than five out of 540 investigations over the past ten years. ER4, 982. Even if the Attorney General had embellished details about those five investigations, the district court's bottom line remains unchanged: the Attorney General "virtually never" uses Schedule B "to investigate

---

[10] It is telling that for the two investigations the Attorney General did identify—L.B. Research and Cancer Fund of America—the Foundation proved conclusively that the Blanket Schedule B Submission Requirement served no purpose. *See* pages 14–16, *supra.*

wrongdoing." ER11. Because any legal error was harmless, these evidentiary rulings cannot supply a basis for reversal. *Jauregui*, 852 F.2d at 1133.[11]

## III. A Permanent Injunction Is Proper

To the extent that the Blanket Schedule B Submission Requirement is unconstitutional, there is no doubt that an injunction was warranted. "Equitable relief has long been recognized as appropriate to prevent government officials from acting unconstitutionally." ER10 (citing *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 491 n.2 (2010)). "Injunctive relief is particularly appropriate to prevent state officials from violating the First Amendment by compelling the disclosure of the names of an organization's supporters." ER10 (citing *Brown*, 459 U.S.

---

[11] The Attorney General also notes in passing in her Statement of the Case that the district court quashed discovery requests seeking the identities of the Foundation's donors. AG Brief 16–17. But the Attorney General offers no actual argument on this point, so it is waived. *Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996) ("an issue referred to in the appellant's statement of the case but not discussed in the body of the opening brief is deemed waived"). In any event, the district court was quite right to protect the Foundation's donors from the very harm this suit seeks to prevent—disclosure of their identities to the Attorney General. *See Perry*, 591 F.3d at 1165 (ordering district court to block discovery that would discourage the exercise of First Amendment rights).

at 101–02; *Louisiana v. NAACP*, 366 U.S. at 297).  Moreover, all four relevant factors favor a permanent injunction.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

***Irreparable Harm***:  The Blanket Schedule B Submission Requirement has a "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association." *Gibson*, 372 U.S. at 556–57; *accord Perry*, 591 F.3d at 1156.  It therefore inflicts irreparable injury:  "Both this court and the Supreme Court have repeatedly held that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (brackets, citations, and quotation marks omitted); *see also Allee v. Medrano*, 416 U.S. 802, 814–15 (1974); ER10–11.

***Lack of Adequate Remedy at Law***:  Legal remedies are inadequate to cure First Amendment violations, so an injunction is the sole and necessary cure.  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009); ER11.

***Balance of Hardships***:  "The balance of hardships also favors granting an junction." ER11.  Schedule Bs are of negligible use to the

Attorney General's oversight of charities. Even in the rare instances when the Attorney General might use them, a dragnet submission requirement is unnecessary because the Attorney General can obtain Schedule Bs through targeted audit letters and subpoenas. Moreover, "the Attorney General has gone without [the Foundation's] Schedule B for over a decade, yet she has demonstrated no harm from not possessing it." ER11. An injunction would therefore impose a "negligible" burden on the Attorney General.[12] ER11. Weighed against the irreparable harm posed to all charities, and the threats and reprisals the Foundation and its donors specifically face, "it is clear that the balance of hardships supports enjoining the Attorney General." ER11.

**Public Interest**: Finally, as this Court has "consistently recognized," there is a "significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir.

---

[12] In a non-sequitur, the Attorney General notes that States suffer "irreparable injury" when their "statutes" are enjoined. AG Brief 60 (citing *Maryland v. King*, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers)). No *statute* has been enjoined here; the Blanket Schedule B Submission Requirement neither is a statute nor effectuates any statutory command. *See* pages 50–53, *supra*.

2014) (citation omitted).  Thus, the public interest also "favors an injunction."  ER11.

## IV.  Preservation of Preemption Argument

Throughout this litigation, the Foundation has respectfully contended that federal tax law preempts the Attorney General from demanding Schedule B.  Nevertheless, the Foundation recognizes that a panel of this Court has rejected this preemption argument as a matter of law.  *CCP*, 784 F.3d at 1318–19.  The Foundation therefore sets forth its preemption argument below for the sake of preserving it.

Under federal tax law, nonprofit organizations "are not required to publicly disclose their donors."  *McCutcheon*, 134 S. Ct. at 1460.  A nonprofit must make "available to the public" every part of its tax return except for the "name or address of any contributor"—*i.e.*, every part except Schedule B.  26 U.S.C. § 6104(b).  The IRS cannot publish an organization's Schedule B, and an organization never needs to publish its own Schedule B.  § 6104(b), (d)(3)(A).

Congress was equally clear in § 6104(c)—entitled "Publication to State officials"—that state officials may request *some* Schedule Bs directly from the IRS, but *not* those of 501(c)(3) organizations such as

84

the Foundation.  § 6104(c)(3).  The Attorney General attempts to circumvent this comprehensive statutory scheme by demanding directly from the Foundation the very Schedule B that Congress has expressly authorized the Foundation to keep to itself—and has expressly prevented California from obtaining from the IRS.  Such an end-run around the statute "frustrate[s] federal policies" and is therefore preempted.  *Arizona v. United States*, 132 S. Ct. 2492, 2503 (2012).

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment to the extent it permanently enjoins the Blanket Schedule B Submission Requirement with respect to the Foundation, and should reverse and remand with instructions that the Blanket Schedule B Submission Requirement should be further enjoined as to all charities.

Dated: January 20, 2017

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Derek L. Shaffer*

Harold A. Barza
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
213.443.3000
halbarza@quinnemanuel.com

Derek L. Shaffer
William A. Burck
Eric C. Lyttle
Keith H. Forst
Jonathan G. Cooper
Carolyn M. Homer
777 Sixth Street NW, 11th Floor
Washington, DC 20001
202.538.8000
derekshaffer@quinnemanuel.com

*Counsel for Americans for Prosperity Foundation*

## REQUEST FOR ORAL ARGUMENT

Americans for Prosperity Foundation respectfully requests that the Court hear oral argument in this case.

/s/ Derek L. Shaffer
Derek L. Shaffer

*Counsel for Americans for Prosperity Foundation*

## STATEMENT OF RELATED CASES

The Foundation is aware of one related case pending in this Court:

*Thomas More Law Center v. Harris*, No. 16-56855 & 16-56902 (9th Cir.) raises issues closely related to this case, *see* Ninth Circuit Rule 28-2.6(c).

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** <u>16-55727, 55786</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is <u>16.172</u> words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated _____
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | /s/ Derek L. Shaffer | Date | January 20, 2017

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

# ADDENDUM

## Table of Contents

**Provision**                                                                 **Page**

Cal. Gov't Code § 12581.....................................................................ADD-1

Cal. Gov't Code § 12585.....................................................................ADD-2

Cal. Gov't Code § 12586.....................................................................ADD-3

Cal. Gov't Code § 12586.1..................................................................ADD-7

Cal. Gov't Code § 12590.....................................................................ADD-8

Cal. Gov't Code § 12591.1..................................................................ADD-9

Cal. Gov't Code § 12599.7................................................................ADD-12

Cal. Code Regs., tit. 11, § 301 .........................................................ADD-13

Cal. Code Regs., tit. 11, § 304 .........................................................ADD-14

Cal. Code Regs., tit. 11, § 305 .........................................................ADD-15

Cal. Code Regs., tit. 11, § 306 .........................................................ADD-16

Cal. Code Regs., tit. 11, § 310 (June 2005–July 2016) ...................ADD-17

Cal. Code Regs., tit. 11, § 310 (adopted July 2016) .......................ADD-18

26 U.S.C. § 6104 ..............................................................................ADD-19

26 U.S.C. § 7213 ..............................................................................ADD-29

26 U.S.C. § 7431 ..............................................................................ADD-32

50-State Survey on Schedule B Requirements................................ADD-35

**Cal. Gov't Code § 12581.  Application of article**

This article applies to all charitable corporations, unincorporated associations, trustees, and other legal entities holding property for charitable purposes, commercial fundraisers for charitable purposes, fundraising counsel for charitable purposes, and commercial coventurers, over which the state or the Attorney General has enforcement or supervisory powers.  The provisions of this article shall not apply to any committee as defined in Section 82013 which is required to and does file any statement pursuant to the provisions of Article 2 (commencing with Section 84200) of Chapter 4 of Title 9.

**Cal. Gov't Code § 12585.  Filing of initial registration form; registration of trustee**

(a) Every charitable corporation, unincorporated association, and trustee subject to this article shall file with the Attorney General an initial registration form, under oath, setting forth information and attaching documents prescribed in accordance with rules and regulations of the Attorney General, within 30 days after the corporation, unincorporated association, or trustee initially receives property.  A trustee is not required to register as long as the charitable interest in a trust is a future interest, but shall do so within 30 days after any charitable interest in a trust becomes a present interest.

(b) The Attorney General shall adopt rules and regulations as to the contents of the initial registration form and the manner of executing and filing that document or documents.

**Cal. Gov't Code § 12586.  Filing of additional reports as to nature of assets held and administration thereof; rules and regulations; time for filing; additional requirements concerning preparation of annual financial statements and auditing**

(a) Except as otherwise provided and except corporate trustees which are subject to the jurisdiction of the Commissioner of Financial Institutions of the State of California under Division 1 (commencing with Section 99) of the Financial Code or to the Comptroller of the Currency of the United States, every charitable corporation, unincorporated association, and trustee subject to this article shall, in addition to filing copies of the instruments previously required, file with the Attorney General periodic written reports, under oath, setting forth information as to the nature of the assets held for charitable purposes and the administration thereof by the corporation, unincorporated association, or trustee, in accordance with rules and regulations of the Attorney General.

(b) The Attorney General shall make rules and regulations as to the time for filing reports, the contents thereof, and the manner of executing and filing them.  The Attorney General may classify trusts and other relationships concerning property held for a charitable purpose as to purpose, nature of assets, duration of the trust or other relationship, amount of assets, amounts to be devoted to charitable purposes, nature of trustee, or otherwise, and may establish different rules for the different classes as to time and nature of the reports required to the ends (1) that he or she shall receive reasonably current, periodic reports as to all charitable trusts or other relationships of a similar nature, which will enable him or her to ascertain whether they are being properly administered, and (2) that periodic reports shall not unreasonably add to the expense of the administration of charitable trusts and similar relationships.  The Attorney General may suspend the filing of reports as to a particular charitable trust or relationship for a reasonable, specifically designated time upon written application of the trustee filed with the Attorney General and after the Attorney General has filed in the register of charitable trusts a written statement

that the interests of the beneficiaries will not be prejudiced thereby and that periodic reports are not required for proper supervision by his or her office.

(c) A copy of an account filed by the trustee in any court having jurisdiction of the trust or other relationship, if the account substantially complies with the rules and regulations of the Attorney General, may be filed as a report required by this section.

(d) The first periodic written report, unless the filing thereof is suspended as herein provided, shall be filed not later than four months and 15 days following the close of the first calendar or fiscal year in which property is initially received.  If any part of the income or principal of a trust previously established is authorized or required to be applied to a charitable purpose at the time this article takes effect, the first report shall be filed at the close of the calendar or fiscal year in which it was registered with the Attorney General or not later than four months and 15 days following the close of the calendar or fiscal period.

(e) Every charitable corporation, unincorporated association, and trustee required to file reports with the Attorney General pursuant to this section that receives or accrues in any fiscal year gross revenue of two million dollars ($2,000,000) or more, exclusive of grants from, and contracts for services with, governmental entities for which the governmental entity requires an accounting of the funds received, shall do the following:

(1) Prepare annual financial statements using generally accepted accounting principles that are audited by an independent certified public accountant in conformity with generally accepted auditing standards.  For any nonaudit services performed by the firm conducting the audit, the firm and its individual auditors shall adhere to the standards for auditor independence set forth in the latest revision of the Government Auditing Standards, issued by the Comptroller General of the United States (the Yellow Book). The Attorney General may, by regulation, prescribe standards for auditor independence in the performance of nonaudit services, including

standards different from those set forth in the Yellow Book. If a charitable corporation or unincorporated association that is required to prepare an annual financial statement pursuant to this subdivision is under the control of another organization, the controlling organization may prepare a consolidated financial statement. The audited financial statements shall be available for inspection by the Attorney General and by members of the public no later than nine months after the close of the fiscal year to which the statements relate. A charity shall make its annual audited financial statements available to the public in the same manner that is prescribed for IRS Form 990 by the latest revision of Section 6104(d) of the Internal Revenue Code and associated regulations.

(2) If it is a corporation, have an audit committee appointed by the board of directors. The audit committee may include persons who are not members of the board of directors, but the member or members of the audit committee shall not include any members of the staff, including the president or chief executive officer and the treasurer or chief financial officer. If the corporation has a finance committee, it must be separate from the audit committee. Members of the finance committee may serve on the audit committee; however, the chairperson of the audit committee may not be a member of the finance committee and members of the finance committee shall constitute less than one-half of the membership of the audit committee. Members of the audit committee shall not receive any compensation from the corporation in excess of the compensation, if any, received by members of the board of directors for service on the board and shall not have a material financial interest in any entity doing business with the corporation. Subject to the supervision of the board of directors, the audit committee shall be responsible for recommending to the board of directors the retention and termination of the independent auditor and may negotiate the independent auditor's compensation, on behalf of the board of directors. The audit committee shall confer with the auditor to satisfy its members that the financial affairs of the corporation are in order, shall review and determine whether to accept the audit, shall

assure that any nonaudit services performed by the auditing firm conform with standards for auditor independence referred to in paragraph (1), and shall approve performance of nonaudit services by the auditing firm. If the charitable corporation that is required to have an audit committee pursuant to this subdivision is under the control of another corporation, the audit committee may be part of the board of directors of the controlling corporation.

(f) If, independent of the audit requirement set forth in paragraph (1) of subdivision (e), a charitable corporation, unincorporated association, or trustee required to file reports with the Attorney General pursuant to this section prepares financial statements that are audited by a certified public accountant, the audited financial statements shall be available for inspection by the Attorney General and shall be made available to members of the public in conformity with paragraph (1) of subdivision (e).

(g) The board of directors of a charitable corporation or unincorporated association, or an authorized committee of the board, and the trustee or trustees of a charitable trust shall review and approve the compensation, including benefits, of the president or chief executive officer and the treasurer or chief financial officer to assure that it is just and reasonable. This review and approval shall occur initially upon the hiring of the officer, whenever the term of employment, if any, of the officer is renewed or extended, and whenever the officer's compensation is modified. Separate review and approval shall not be required if a modification of compensation extends to substantially all employees. If a charitable corporation is affiliated with other charitable corporations, the requirements of this section shall be satisfied if review and approval is obtained from the board, or an authorized committee of the board, of the charitable corporation that makes retention and compensation decisions regarding a particular individual.

## Cal. Gov't Code § 12586.1.  Late or additional fees for late registration statements and financial reports

In addition to a registration fee, a charitable corporation or trustee, commercial fundraiser, fundraising counsel, or coventurer may be assessed a late fee or an additional fee of twenty-five dollars ($25) for each month or part of the month after the date on which the registration statement and financial report were due to be filed or after the period of extension granted for the filing if the charitable corporation or trustee, commercial fundraiser, fundraising counsel, or coventurer does any of the following:

(a) Exists and operates in California without being registered.

(b) Solicits contributions in California without being registered or, if applicable, bonded.

(c) Fails to file its first report no later than four months and 15 days following the close of each calendar or fiscal year and has not requested an extension of time to file the annual report.

(d) Fails to file its subsequent annual report no later than four months and 15 days following the close of each calendar or fiscal year subsequent to the filing of the first report and has not requested an extension of time to file the annual report.

(e) Fails to file its annual registration/renewal form within the time specified by the Attorney General irrespective of other report filing requirements.

(f) Fails to correct the deficiencies in its registration or annual report within 10 days of receipt of written notice of those deficiencies.

**Cal. Gov't Code § 12590. Public inspection of register and reports**

Subject to reasonable rules and regulations adopted by the Attorney General, the register, copies of instruments, and the reports filed with the Attorney General shall be open to public inspection. The Attorney General shall withhold from public inspection any instrument so filed whose content is not exclusively for charitable purposes.

**Cal. Gov't Code § 12591.1. Violation of article; intent to deceive or defraud any charity or individual; civil penalty; authority of Attorney General**

(a) Any person who violates any provision of this article with intent to deceive or defraud any charity or individual is liable for a civil penalty not exceeding ten thousand dollars ($10,000).

(b) The Attorney General may issue a cease and desist order whenever the Attorney General finds that any entity or person that is subject to the provisions of this article pursuant to Section 12581, or its agent, servant, or employee, has committed an act that would constitute a violation of, or is operating in violation of, this article, or its implementing regulations, or an order issued by the Attorney General, including, but not limited to, all of the following:

(1) Has refused or failed, after notice, to produce any records of the organization or to disclose any information required to be disclosed under this article or Chapter 4 (commencing with Section 300) of Division 1 of Title 11 of the California Code of Regulations.

(2) Has made a material false statement in an application, statement, or report required to be filed under this article or Chapter 4 (commencing with Section 300) of Division 1 of Title 11 of the California Code of Regulations.

(3) Has failed to file a financial report, or has filed an incomplete financial report, that is required by this article or Chapter 4 (commencing with Section 300) of Division 1 of Title 11 of the California Code of Regulations.

(4) Has engaged in any act prohibited pursuant to Section 12599.6.

(c) The Attorney General may impose a penalty on any person or entity, not to exceed one thousand dollars ($1,000) per act or omission, for each act or omission that constitutes a violation of this article or Chapter 4 (commencing with Section 300) of Division 1 of Title 11 of the California Code of Regulations. At least five days prior to imposing that penalty, the Attorney General shall provide notice to the person or entity that

committed the violation by certified mail to the address of record at the Registry of Charitable Trusts.  Penalties shall accrue, commencing on the fifth day after notice is given, at a rate of one hundred dollars ($100) per day for each day until that person or entity corrects that violation. Penalties shall stop accruing as of the date set forth in the written notice provided by the Attorney General that the violation or omission subject to penalties has been corrected or remedied.

(d) If the Attorney General assesses penalties under this section, the Attorney General may suspend the registration of that person or entity in accordance with the procedures set forth in Section 999.6 of Title 11 of the California Code of Regulations.  Registration shall be automatically suspended until the fine is paid and no registration shall be renewed until the fine is paid.

(e) Any person or entity that the Attorney General has filed an action against pursuant to this section may request a hearing to review that action in accordance with the procedures set forth in Chapter 15 (commencing with Section 999.1) of Division 1 of Title 11 of the California Code of Regulations and rules adopted by the Attorney General.  Any request for hearing shall be made within 30 days after the Attorney General has served the person with notice of the action. T hat notice shall be deemed effective upon mailing.

(f) The Attorney General may apply to a superior court of the State of California for relief, and the court may issue a temporary injunction or a permanent injunction to restrain violations of this chapter, appoint a receiver, order restitution or an accounting, or grant other relief as may be appropriate to ensure the due application of charitable funds.  Those proceedings shall be brought in the name of the state.

(g) All penalties paid to the Attorney General pursuant to this section shall be used by the Department of Justice in accordance with the provisions of Section 12586.2.

(h) Any offense committed under this article involving a solicitation may be deemed to have been committed at either the place at which the

solicitation was initiated or at the place where the solicitation was received.

(i) Any person who violates only subdivision (c), (d), (e), or (f) of Section 12586.1 shall not be liable for a civil penalty under subdivision (b) if the person (1) has not received reasonable notice of the violation and (2) has not been given a reasonable opportunity to correct the violation. The Attorney General shall notify in writing a person who violates only subdivision (c), (d), (e), or (f) of Section 12586.1 that he or she has 30 days to correct the violation.

(j) The recovery of a civil penalty pursuant to this section precludes assessment of a late fee pursuant to Section 12586.1 for the same offense.

**Cal. Gov't Code § 12599.7. Recordkeeping by commercial fundraisers**

(a) A commercial fundraiser for charitable purposes shall maintain during each solicitation campaign and for not less than 10 years following the completion of each solicitation campaign records, including any electronic records, containing the following information, which shall be available for inspection upon demand by the Attorney General:

(1) The date and amount of each contribution received as a result of the solicitation campaign and, for noncash contributions, the name and mailing address of each contributor.

(2) The name and residence address of each employee, agent, or other person involved in the solicitation campaign.

(3) Records of all revenue received and expenses incurred in the course of the solicitation campaign.

(4) For each account into which the commercial fundraiser deposited revenue from the solicitation campaign, the account number and the name and location of the bank or other financial institution in which the account was maintained.

(b) If a commercial fundraiser for charitable purposes sells tickets to an event and represents that tickets will be donated for use by another, the commercial fundraiser shall maintain for not less than 10 years following the completion of the event records containing the following information, which shall be available for inspection upon demand by the Attorney General:

(1) The number of tickets purchased and donated by each contributor.

(2) The name and address of all organizations receiving donated tickets for use by others, including the number of tickets received by each organization.

# Cal. Code Regs., tit. 11, § 301. Periodic Written Reports.

Except as otherwise provided in the Act, every charitable corporation, unincorporated association, trustee, or other person subject to the reporting requirements of the Act shall also file with the Attorney General periodic written reports, under oath, setting forth information as to the nature of the assets held for charitable purposes and the administration thereof by such corporation, unincorporated association, trustee, or other person.  Except as otherwise provided in these regulations, these reports include the Annual Registration Renewal Fee Report, ( "RRF-1" 3/05), hereby incorporated by reference, which must be filed with the Registry of Charitable Trusts annually by all registered charities, as well as the Internal Revenue Service Form 990, which must be filed on an annual basis with the Registry of Charitable Trusts, as well as with the Internal Revenue Service.  At the time of the annual renewal of registration filing the RRF-1, the registrant must submit a fee, as set forth in section 311.

A tax-exempt charitable organization which is allowed to file form 990-PF or 990-EZ with the Internal Revenue Service, may file that form with the Registry of Charitable Trusts in lieu of Form 990.

A charitable organization that is not exempt from taxation under federal law shall use Internal Revenue Service Form 990 to comply with the reporting provisions of the Supervision of Trustees and Fundraisers for Charitable Purposes Act.  The form shall include, at the top of the page, in 10-point type, all capital letters, "THIS ORGANIZATION IS NOT EXEMPT FROM TAXATION."

Registration requirements for commercial fundraisers for charitable purposes, fundraising counsel for charitable purposes, and commercial coventurers are set forth in section 308.

**Cal. Code Regs., tit. 11, § 304.  Time of Filing Reports.**

The first such periodic report shall be filed as required by paragraph (d) of section 12586 of the Government Code.

**Cal. Code Regs., tit. 11, § 305. Annual Filing of Reports.**

After the first periodic report is filed as required by section 304 of these regulations, periodic written reports shall thereafter be filed on an annual basis unless specifically required or permitted to be filed on other than an annual basis as set forth in these regulations, or when filing has been suspended by the Attorney General pursuant to Government Code section 12586. The time for filing any periodic report subsequent to the first periodic report shall be not later than four (4) months and fifteen (15) days following the close of each calendar or fiscal year subsequent to the filing of the first report, but in no event less than once annually, unless for good cause extension of such annual filing has been granted by the Attorney General, or otherwise excused. If the Internal Revenue Service grants an extension to file the Form 990, 990-PF or 990-EZ that extension will be honored by the Registry of Charitable Trusts for purposes of filing the Form 990, 990-PF or 990-EZ and the Annual Registration Renewal Fee Report ( "RRF-1") with the Registry of Charitable Trusts. The RRF-1 and the Form 990, 990-PF or 990-EZ shall be filed simultaneously with the Registry of Charitable Trusts.

## Cal. Code Regs., tit. 11, § 306. Contents of Reports.

(a) Periodic reports shall be submitted under oath and shall set forth in detail all of the information required by the applicable forms set forth in these regulations. Incomplete or incorrect reports will not be accepted as meeting the requirements of the law.

(b) A copy of an account filed by a trustee in a court having jurisdiction of the trust shall not be accepted in lieu of a report on official forms unless such court accounting is identical in form and content with the official forms and is compatible without alteration with electronic data processing equipment in the same manner as reports on official forms.

(c) When requested by the Attorney General any periodic report shall be supplemented to include such additional information as the Attorney General deems necessary to enable the Attorney General to ascertain whether the corporation, trust or other relationship is being properly administered.

**Cal. Code Regs., tit. 11, § 310. Public Inspection of Charitable Trust Records. (Operative Dates: June 13, 2005–July 7, 2016)**

The register, copies of instruments and the reports filed with the Attorney General, except as provided in Government Code section 12590, shall be open to public inspection at the Registry of Charitable Trusts in the office of the Attorney General, Sacramento, California, at such reasonable times as the Attorney General may determine. Such inspection shall at all times be subject to the control and supervision of an employee of the Office of the Attorney General.

**Cal. Code Regs., tit. 11, § 310. Public Inspection of Charitable Trust Records. (Operative Date: July 8, 2016)**

(a) The register, copies of instruments and the reports filed with the Attorney General, except as provided in subdivision (b) and pursuant to Government Code section 12590, shall be open to public inspection at the Registry of Charitable Trusts in the office of the Attorney General, Sacramento, California, at such reasonable times as the Attorney General may determine. Such inspection shall at all times be subject to the control and supervision of an employee of the Office of the Attorney General.

(b) Donor information exempt from public inspection pursuant to Internal Revenue Code section 6104 (d)(3)(A) shall be maintained as confidential by the Attorney General and shall not be disclosed except as follows:

(1) In a court or administrative proceeding brought pursuant to the Attorney General's charitable trust enforcement responsibilities; or

(2) In response to a search warrant.

**26 U.S.C. § 6104.  Publicity of information required from certain exempt organizations and certain trusts**

**(a) Inspection of applications for tax exemption or notice of status.--**

    **(1) Public inspection.--**

        **(A) Organizations described in section 501 or 527.**--If an organization described in section 501(c) or (d) is exempt from taxation under section 501(a) for any taxable year or a political organization is exempt from taxation under section 527 for any taxable year, the application filed by the organization with respect to which the Secretary made his determination that such organization was entitled to exemption under section 501(a) or notice of status filed by the organization under section 527(i), together with any papers submitted in support of such application or notice, and any letter or other document issued by the Internal Revenue Service with respect to such application or notice shall be open to public inspection at the national office of the Internal Revenue Service.  In the case of any application or notice filed after the date of the enactment of this subparagraph, a copy of such application or notice and such letter or document shall be open to public inspection at the appropriate field office of the Internal Revenue Service (determined under regulations prescribed by the Secretary).  Any inspection under this subparagraph may be made at such times, and in such manner, as the Secretary shall by regulations prescribe.  After the application of any organization for exemption from taxation under section 501(a) has been opened to public inspection under this subparagraph, the Secretary shall, on the request of any person with respect to such organization, furnish a statement indicating the subsection and paragraph of section 501 which it has been determined describes such organization.

**(B) Pension, etc., plans.**--The following shall be open to public inspection at such times and in such places as the Secretary may prescribe:

**(i)** any application filed with respect to the qualification of a pension, profit-sharing, or stock bonus plan under section 401(a) or 403(a), an individual retirement account described in section 408(a), or an individual retirement annuity described in section 408(b),

**(ii)** any application filed with respect to the exemption from tax under section 501(a) of an organization forming part of a plan or account referred to in clause (i),

**(iii)** any papers submitted in support of an application referred to in clause (i) or (ii), and

**(iv)** any letter or other document issued by the Internal Revenue Service and dealing with the qualification referred to in clause (i) or the exemption from tax referred to in clause (ii).

Except in the case of a plan participant, this subparagraph shall not apply to any plan referred to in clause (i) having not more than 25 participants.

**(C) Certain names and compensation not to be opened to public inspection.**--In the case of any application, document, or other papers, referred to in subparagraph (B), information from which the compensation (including deferred compensation) of any individual may be ascertained shall not be open to public inspection under subparagraph (B).

**(D) Withholding of certain other information.**--Upon request of the organization submitting any supporting papers described in subparagraph (A) or (B), the Secretary shall withhold from public inspection any information contained therein which he determines relates to any trade secret, patent, process, style of work, or apparatus, of the organization, if he determines that public disclosure of such information would adversely affect the

ADD-20

organization. The Secretary shall withhold from public inspection any information contained in supporting papers described in subparagraph (A) or (B) the public disclosure of which he determines would adversely affect the national defense.

**(2) Inspection by committees of Congress.**--Section 6103(f) shall apply with respect to--

**(A)** the application for exemption of any organization described in section 501(c) or (d) which is exempt from taxation under section 501(a) for any taxable year or notice of status of any political organization which is exempt from taxation under section 527 for any taxable year, and any application referred to in subparagraph (B) of subsection (a)(1) of this section, and

**(B)** any other papers which are in the possession of the Secretary and which relate to such application, as if such papers constituted returns.

**(3) Information available on Internet and in person.**--

**(A) In general.**--The Secretary shall make publicly available, on the Internet and at the offices of the Internal Revenue Service--

**(i)** a list of all political organizations which file a notice with the Secretary under section 527(i), and

**(ii)** the name, address, electronic mailing address, custodian of records, and contact person for such organization.

**(B) Time to make information available.**--The Secretary shall make available the information required under subparagraph (A) not later than 5 business days after the Secretary receives a notice from a political organization under section 527(i).

**(b) Inspection of annual returns.**--The information required to be furnished by sections 6033, 6034, and 6058, together with the names and addresses of such organizations and trusts, shall be made available to the public at such times and in such places as the Secretary may prescribe. Nothing in this subsection shall authorize the Secretary to

disclose the name or address of any contributor to any organization or trust (other than a private foundation, as defined in section 509(a) or a political organization exempt from taxation under section 527) which is required to furnish such information.  In the case of an organization described in section 501(d), this subsection shall not apply to copies referred to in section 6031(b) with respect to such organization.  In the case of a trust which is required to file a return under section 6034(a), this subsection shall not apply to information regarding beneficiaries which are not organizations described in section 170(c).  Any annual return which is filed under section 6011 by an organization described in section 501(c)(3) and which relates to any tax imposed by section 511 (relating to imposition of tax on unrelated business income of charitable, etc., organizations) shall be treated for purposes of this subsection in the same manner as if furnished under section 6033.

**(c) Publication to State officials.--**

**(1) General rule for charitable organizations.**--In the case of any organization which is described in section 501(c)(3) and exempt from taxation under section 501(a), or has applied under section 508(a) for recognition as an organization described in section 501(c)(3), the Secretary at such times and in such manner as he may by regulations prescribe shall--

**(A)** notify the appropriate State officer of a refusal to recognize such organization as an organization described in section 501(c)(3), or of the operation of such organization in a manner which does not meet, or no longer meets, the requirements of its exemption,

**(B)** notify the appropriate State officer of the mailing of a notice of deficiency of tax imposed under section 507 or chapter 41 or 42, and

**(C)** at the request of such appropriate State officer, make available for inspection and copying such returns, filed statements, records, reports, and other information, relating to a

determination under subparagraph (A) or (B) as are relevant to any determination under State law.

**(2) Disclosure of proposed actions related to charitable organizations.**--

**(A) Specific notifications.**--In the case of an organization to which paragraph (1) applies, the Secretary may disclose to the appropriate State officer--

**(i)** a notice of proposed refusal to recognize such organization as an organization described in section 501(c)(3) or a notice of proposed revocation of such organization's recognition as an organization exempt from taxation,

**(ii)** the issuance of a letter of proposed deficiency of tax imposed under section 507 or chapter 41 or 42, and

**(iii)** the names, addresses, and taxpayer identification numbers of organizations which have applied for recognition as organizations described in section 501(c)(3).

**(B) Additional disclosures.**--Returns and return information of organizations with respect to which information is disclosed under subparagraph (A) may be made available for inspection by or disclosed to an appropriate State officer.

**(C) Procedures for disclosure.**--Information may be inspected or disclosed under subparagraph (A) or (B) only--

**(i)** upon written request by an appropriate State officer, and

**(ii)** for the purpose of, and only to the extent necessary in, the administration of State laws regulating such organizations.

Such information may only be inspected by or disclosed to a person other than the appropriate State officer if such person is an officer or employee of the State and is designated by the appropriate State officer to receive the returns or return information under this paragraph on behalf of the appropriate State officer.

**(D) Disclosures other than by request.**--The Secretary may make available for inspection or disclose returns and return information of an organization to which paragraph (1) applies to an appropriate State officer of any State if the Secretary determines that such returns or return information may constitute evidence of noncompliance under the laws within the jurisdiction of the appropriate State officer.

**(3) Disclosure with respect to certain other exempt organizations.**--Upon written request by an appropriate State officer, the Secretary may make available for inspection or disclosure returns and return information of any organization described in section 501(c) (other than organizations described in paragraph (1) or (3) thereof) for the purpose of, and only to the extent necessary in, the administration of State laws regulating the solicitation or administration of the charitable funds or charitable assets of such organizations.   Such information may only be inspected by or disclosed to a person other than the appropriate State officer if such person is an officer or employee of the State and is designated by the appropriate State officer to receive the returns or return information under this paragraph on behalf of the appropriate State officer.

**(4) Use in civil judicial and administrative proceedings.**--Returns and return information disclosed pursuant to this subsection may be disclosed in civil administrative and civil judicial proceedings pertaining to the enforcement of State laws regulating such organizations in a manner prescribed by the Secretary similar to that for tax administration proceedings under section 6103(h)(4).

**(5) No disclosure if impairment.**--Returns and return information shall not be disclosed under this subsection, or in any proceeding described in paragraph (4), to the extent that the Secretary determines that such disclosure would seriously impair Federal tax administration.

**(6) Definitions.**--For purposes of this subsection--

**(A) Return and return information.**--The terms "return" and "return information" have the respective meanings given to such terms by section 6103(b).

**(B) Appropriate State officer.**--The term "appropriate State officer" means--

**(i)** the State attorney general,

**(ii)** the State tax officer,

**(iii)** in the case of an organization to which paragraph (1) applies, any other State official charged with overseeing organizations of the type described in section 501(c)(3), and

**(iv)** in the case of an organization to which paragraph (3) applies, the head of an agency designated by the State attorney general as having primary responsibility for overseeing the solicitation of funds for charitable purposes.

**(d) Public inspection of certain annual returns, reports, applications for exemption, and notices of status.**--

**(1) In general.**--In the case of an organization described in subsection (c) or (d) of section 501 and exempt from taxation under section 501(a) or an organization exempt from taxation under section 527(a)--

**(A)** a copy of--

**(i)** the annual return filed under section 6033 (relating to returns by exempt organizations) by such organization,

**(ii)** any annual return which is filed under section 6011 by an organization described in section 501(c)(3) and which relates to any tax imposed by section 511 (relating to imposition of tax on unrelated business income of charitable, etc., organizations),

**(iii)** if the organization filed an application for recognition of exemption under section 501 or notice of status under section

ADD-25

527(i), the exempt status application materials or any notice materials of such organization, and

**(iv)** the reports filed under section 527(j) (relating to required disclosure of expenditures and contributions) by such organization,

shall be made available by such organization for inspection during regular business hours by any individual at the principal office of such organization and, if such organization regularly maintains 1 or more regional or district offices having 3 or more employees, at each such regional or district office, and

**(B)** upon request of an individual made at such principal office or such a regional or district office, a copy of such annual return, reports, and exempt status application materials or such notice materials shall be provided to such individual without charge other than a reasonable fee for any reproduction and mailing costs.

The request described in subparagraph (B) must be made in person or in writing. If such request is made in person, such copy shall be provided immediately and, if made in writing, shall be provided within 30 days.

**(2) 3-year limitation on inspection of returns.**--Paragraph (1) shall apply to an annual return filed under section 6011 or 6033 only during the 3-year period beginning on the last day prescribed for filing such return (determined with regard to any extension of time for filing).

**(3) Exceptions from disclosure requirement.**--

**(A) Nondisclosure of contributors, etc.**--In the case of an organization which is not a private foundation (within the meaning of section 509(a)) or a political organization exempt from taxation under section 527, paragraph (1) shall not require the disclosure of the name or address of any contributor to the

organization. In the case of an organization described in section 501(d), paragraph (1) shall not require the disclosure of the copies referred to in section 6031(b) with respect to such organization.

**(B) Nondisclosure of certain other information.**--Paragraph (1) shall not require the disclosure of any information if the Secretary withheld such information from public inspection under subsection (a)(1)(D).

**(4) Limitation on providing copies.**--Paragraph (1)(B) shall not apply to any request if, in accordance with regulations promulgated by the Secretary, the organization has made the requested documents widely available, or the Secretary determines, upon application by an organization, that such request is part of a harassment campaign and that compliance with such request is not in the public interest.

**(5) Exempt status application materials.**--For purposes of paragraph (1), the term "exempt status application materials" means the application for recognition of exemption under section 501 and any papers submitted in support of such application and any letter or other document issued by the Internal Revenue Service with respect to such application.

**(6) Notice materials.**--For purposes of paragraph (1), the term "notice materials" means the notice of status filed under section 527(i) and any papers submitted in support of such notice and any letter or other document issued by the Internal Revenue Service with respect to such notice.

**(7) Disclosure of reports by Internal Revenue Service.**--Any report filed by an organization under section 527(j) (relating to required disclosure of expenditures and contributions) shall be made available to the public at such times and in such places as the Secretary may prescribe.

**(8) Application to nonexempt charitable trusts and nonexempt private foundations.**--The organizations referred to in paragraphs (1) and (2) of section 6033(d) shall comply with the

requirements of this subsection relating to annual returns filed under section 6033 in the same manner as the organizations referred to in paragraph (1).

# 26 U.S.C. § 7213.  Unauthorized disclosure of information

## (a) Returns and return information.--

**(1) Federal employees and other persons.--**It shall be unlawful for any officer or employee of the United States or any person described in section 6103(n) (or an officer or employee of any such person), or any former officer or employee, willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)).  Any violation of this paragraph shall be a felony punishable upon conviction by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution, and if such offense is committed by any officer or employee of the United States, he shall, in addition to any other punishment, be dismissed from office or discharged from employment upon conviction for such offense.

**(2) State and other employees.--**It shall be unlawful for any person (not described in paragraph (1)) willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)) acquired by him or another person under subsection (d), (i)(3)(B)(i) or (7)(A)(ii), (k)(10), (l)(6), (7), (8), (9), (10), (12), (15), (16), (19), (20), or (21) or (m)(2), (4), (5), (6), or (7) of section 6103 or under section 6104(c).  Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

**(3) Other persons.--**It shall be unlawful for any person to whom any return or return information (as defined in section 6103(b)) is disclosed in a manner unauthorized by this title thereafter willfully to print or publish in any manner not provided by law any such return or return information.  Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

**(4) Solicitation.**--It shall be unlawful for any person willfully to offer any item of material value in exchange for any return or return information (as defined in section 6103(b)) and to receive as a result of such solicitation any such return or return information.  Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

**(5) Shareholders.**--It shall be unlawful for any person to whom a return or return information (as defined in section 6103(b)) is disclosed pursuant to the provisions of section 6103(e)(1)(D)(iii) willfully to disclose such return or return information in any manner not provided by law.  Any violation of this paragraph shall be a felony punishable by a fine in any amount not to exceed $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

**(b) Disclosure of operations of manufacturer or producer.**--Any officer or employee of the United States who divulges or makes known in any manner whatever not provided by law to any person the operations, style of work, or apparatus of any manufacturer or producer visited by him in the discharge of his official duties shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution; and the offender shall be dismissed from office or discharged from employment.

**(c) Disclosures by certain delegates of Secretary.**--All provisions of law relating to the disclosure of information, and all provisions of law relating to penalties for unauthorized disclosure of information, which are applicable in respect of any function under this title when performed by an officer or employee of the Treasury Department are likewise applicable in respect of such function when performed by any person who is a "delegate" within the meaning of section 7701(a)(12)(B).

**(d) Disclosure of software.**--Any person who willfully divulges or makes known software (as defined in section 7612(d)(1)) to any person

in violation of section 7612 shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

**(e) Cross references.--**

**(1) Penalties for disclosure of information by preparers of returns.--**

For penalty for disclosure or use of information by preparers of returns, see section 7216.

**(2) Penalties for disclosure of confidential information.--**

For penalties for disclosure of confidential information by any officer or employee of the United States or any department or agency thereof, see 18 U.S.C. 1905.

**26 U.S.C. § 7431. Civil damages for unauthorized inspection or disclosure of returns and return information**

**(a) In general.--**

**(1) Inspection or disclosure by employee of United States.**--If any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

**(2) Inspection or disclosure by a person who is not an employee of United States.**--If any person who is not an officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103 or in violation of section 6104(c), such taxpayer may bring a civil action for damages against such person in a district court of the United States.

**(b) Exceptions**.--No liability shall arise under this section with respect to any inspection or disclosure--

**(1)** which results from a good faith, but erroneous, interpretation of section 6103, or

**(2)** which is requested by the taxpayer.

**(c) Damages.**--In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of--

**(1)** the greater of--

**(A)** $1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or

**(B)** the sum of--

**(i)** the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus

**(ii)** in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages, plus

**(2)** the costs of the action, plus

**(3)** in the case of a plaintiff which is described in section 7430(c)(4)(A)(ii), reasonable attorneys fees, except that if the defendant is the United States, reasonable attorneys fees may be awarded only if the plaintiff is the prevailing party (as determined under section 7430(c)(4)).

**(d) Period for bringing action.**--Notwithstanding any other provision of law, an action to enforce any liability created under this section may be brought, without regard to the amount in controversy, at any time within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure.

**(e) Notification of unlawful inspection and disclosure**.--If any person is criminally charged by indictment or information with inspection or disclosure of a taxpayer's return or return information in violation of--

**(1)** paragraph (1) or (2) of section 7213(a),

**(2)** section 7213A(a), or

**(3)** subparagraph (B) of section 1030(a)(2) of Title 18, United States Code,

the Secretary shall notify such taxpayer as soon as practicable of such inspection or disclosure.

**(f) Definitions**.--For purposes of this section, the terms "inspect", "inspection", "return", and "return information" have the respective meanings given such terms by section 6103(b).

**(g) Extension to information obtained under section 3406.**--For purposes of this section--

    **(1)** any information obtained under section 3406 (including information with respect to any payee certification failure under subsection (d) thereof) shall be treated as return information, and

    **(2)** any inspection or use of such information other than for purposes of meeting any requirement under section 3406 or (subject to the safeguards set forth in section 6103) for purposes permitted under section 6103 shall be treated as a violation of section 6103.

For purposes of subsection (b), the reference to section 6103 shall be treated as including a reference to section 3406.

**(h) Special rule for information obtained under section 6103(k)(9).**--For purposes of this section, any reference to section 6103 shall be treated as including a reference to section 6311(e).

**50-State Survey on Schedule B Submission Requirements in Connection with Charitable Registration Filings**

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| Alabama | No | Ala. Code § 13A-9-71(g) | Alabama permits charities to file either a state financial statement or IRS Form 990, but does not mention attachments or Schedule B. |
| Alaska | No | Alaska Stat. §§ 45.68.010–45.68.900<br><br>Alaska Admin. Code tit. 9, § 12.010 | Alaska permits charities to file either an audited financial statement or IRS Form 990, but does not mention attachments or Schedule B. |
| Arizona | No | -- | Arizona does not require charities to submit an annual report. |
| Arkansas | No | Ark. Code Ann. §§ 4-28-403 | Arkansas specifically exempts charities from filing "any schedules of contributors." Ark. Code Ann. § 4-28-403(a)(1). |
| Colorado | No | Colo. Rev. Stat. § 6-16-104 | Colorado specifically exempts charities from filing Schedule B. Colo. Rev. Stat. § 6-16-104(f). |
| Connecticut | No | Conn. Gen. Stat. §§ 21a-175–190l<br><br>Conn. Agencies Regs. §§ 21a-190k-1–190k-8. | Connecticut requires IRS Form 990 and attachments, but does not mention Schedule B. |

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| Delaware | No | -- | Delaware does not require charities to submit an annual report. |
| District of Columbia | No | D.C. Code §§ 47-1700–1714, 47-2581<br><br>D.C. Mun. Regs. tit. 16, § 13 | The District of Columbia does not require charities to submit an annual report, except for a bi-annual application to solicit donations. |
| Florida | No | Fla. Stat. §§ 496.401–496.426 | Florida allows charities to "redact information that is not subject to public inspection" under federal law.  Fla. Stat. § 496.407(2)(a). |
| Georgia | No | Ga. Code Ann. § 43-17-5 | Georgia requires IRS Form 990, but does not mention attachments or Schedule B. |
| Hawaii | Yes | Haw. Rev. Stat. § 467B-1<br><br>Hawaii Charity Financial Report Guide (September 2014) | Hawaii demands that charities file Schedule B in the "Hawaii Charity Annual Financial Report Guide" of September 2014, despite a lack of statutory authority. |
| Idaho | No | -- | Idaho does not require charities to submit an annual report. |

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| Illinois | No | 225 Ill. Comp. Stat. 460/4 <br><br> Ill. Admin. Code tit. 14, § 400.60 <br><br> Form AG990-IL.INS | Illinois specifically instructs charities not to file Schedule B. *See* Ill. Charitable Org. – Form AG990-IL Filing Instructions ¶ 3. |
| Indiana | No | -- | Indiana does not require charities to submit an annual report. |
| Iowa | No | -- | Iowa does not require charities to submit an annual report. |
| Kansas | No | Kan. Stat. Ann. § 17-1763 <br><br> Kan. Admin. Regs. § 7-42-1(b) | Kansas specifically instructs charities to "not include any list of contributor names." Kan. Admin. Regs. § 7-42-1(b). |
| Kentucky | No | Ky. Rev. Stat. Ann. § 367.657 | Kentucky requires IRS Form 990, but does not mention attachments or Schedule B. |
| Louisiana | No | La. Rev. Stat. Ann. § 51:1901 <br><br> La. Admin. Code tit. 16, § 515 | Louisiana does not require charities to file IRS Form 990. |
| Maine | No | Me. Rev. Stat. tit. 9, § 5005-B <br><br> Maine Annual Fundraising Activity Report Form | Maine does not require charities to file IRS Form 990. |

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| Maryland | No | Md. Code Bus. Reg. § 6-408 | Maryland requires IRS Form 990, but does not mention attachments or Schedule B. |
| Massa-chusetts | No | Mass. Gen. Laws ch. 12, § 8F<br><br>Mass. Form PC Instructions | Massachusetts requires IRS Form 990, and specifically instructs charities to include "all required IRS schedules except Schedule B." Mass. Form PC. |
| Michigan | No | Mich. Comp. Laws §§ 400.275, 400.277<br><br>Mi. Renewal Solicitation Form (CTS-02) | Michigan specifically instructs charities not to file "a copy of Schedule B, Schedule of Contributors." Mi. Renewal Solicitation Form (CTS-02). |
| Minnesota | No | Minn. Stat. § 309.53 | Minnesota specifically instructs charities not to file "any schedules of contributors to the organizations." Minn. Stat. § 309.53. |
| Mississippi | No | Miss. Code Ann. § 79-11-507(1)<br><br>1-15 Miss. Code R. § 2.05 | Mississippi requires IRS Form 990 and attachments, but does not mention Schedule B. |
| Missouri | No | Mo. Rev. Stat. § 407.462(2)<br><br>Mo. Charitable Organizations Annual Report Form | Missouri does not require charities to file IRS Form 990. |

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| Montana | No | -- | Montana does not require charities to submit an annual report. |
| Nebraska | No | -- | Nebraska does not require charities to submit an annual report. |
| Nevada | No | -- | Nevada does not require charities to submit an annual report. |
| New Hampshire | No | N.H. Rev. Stat. Ann. § 7:28. | New Hampshire requires IRS Form 990, but does not mention attachments or Schedule B. |
| New Jersey | No | N.J. Stat. Ann. § 45:17A-18<br><br>N.J. Admin Code § 13:48-5.1(b)(5) | New Jersey requires IRS Form 990 and all schedules, but does not mention Schedule B. |
| New Mexico | No | N.M. Stat. Ann. § 57-22-6(c) | New Mexico requires charities to file IRS Form 990 "and the accompanying Schedule A." It does not mention Schedule B. |
| New York | Yes | N.Y. Exec. Law § 172-b<br><br>N.Y. Comp. Codes R. & Regs. tit. 13, § 91.5<br><br>N.Y. Form CHAR500 | New York requires IRS Form 990 and all schedules. Form CHAR500 specifically demands "[a]ll additional . . . Schedules including Schedule B." |

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| North Carolina | No | N.C. Gen. Stat. § 131F-5(c)<br><br>N.C. Solicitation License Application Form | North Carolina requires charities to file IRS Form 990 and Schedule A. It does not mention Schedule B. |
| North Dakota | No | N.D. Cent. Code § 50-22-04 | North Dakota specifically instructs charities not to file "schedules of contributors." N.D. Cent. Code § 50-22-04(4). |
| Ohio | No | Ohio Rev. Code Ann. § 1716.04<br><br>Ohio Charitable Registration and Filing User Guide | Ohio does not require charities to file IRS Form 990. |
| Oklahoma | No | Okla. Stat. tit. 18, § 552.3<br><br>Okla. SOS Form 101-01/13 | Oklahoma requires IRS Form 990, but does not mention Schedule B. |
| Oregon | No | Or. Rev. Stat. § 128.670<br><br>Or. Admin. R. § 137-010-0020(7)<br><br>Or. Form CT-12F | Oregon specifically instructs charities not "to submit as part of its annual report to the Attorney General a copy of any IRS form 990 Schedule B listing of contributors that would be exempt from disclosure under federal law." Or. Admin. R. § 137-010-0020(7). |

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| Pennsylvania | No | 10 Pa. Cons. Stat. § 162.5(b)<br><br>Pa. Form BC-10 | Pennsylvania requires charities to file IRS Form 990 and Schedule A. It does not mention Schedule B. |
| Rhode Island | No | R.I. Gen. Laws § 5-53.1-4 | Rhode Island permits charities to file either a state financial statement or IRS Form 990, but does not mention attachments or Schedule B. |
| South Carolina | No | S.C. Code Ann. § 33-56-10 | South Carolina specifically exempts charities from filing information that "the [IRS] would not release pursuant to a [FOIA] request." S.C. Code Ann. § 33-56-10(C). |
| South Dakota | No | -- | South Dakota does not require charities to submit an annual report. |
| Tennessee | No | Tenn. Code Ann. § 48-101-506<br><br>Tenn. Comp. R. & Regs. 1360-03-01-.03(1)<br><br>Filing Instructions For Renewing Registration | Tennessee specifically instructs charities to "only submit the public disclosure copy of the Form 990" and to not file Schedule B. *See* Tenn. Filing Instructions For Renewing Registration . |
| Texas | No | -- | Texas does not require charities to submit an annual report. |

ADD-41

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| Utah | No | Utah Code Ann. §§ 13-22-6, 13-22-15<br><br>Utah Admin. Code r. 152-22 | Utah requires IRS Form 990, but does not mention attachments or Schedule B. |
| Vermont | No | -- | Vermont does not require charities to submit an annual report. |
| Virginia | No | Va. Code Ann. § 57-49<br><br>2 Va. Admin. Code § 5-610-30(A) | Virginia requires IRS Form 990, and specifically instructs charities to include "all schedules, as required by the IRS, except Schedule B." 2 Va. Admin. Code § 5-610-30(A)(2)(a). |
| Washington | No | Wash. Rev. Code Ann. § 19.09.075(3) | Washington does not require charities to file IRS Form 990, as long as they "compl[y] with all federal tax law requirements with respect to public inspection." Wash. Rev. Code Ann. § 19.09.075(3) |
| West Virginia | No | W. Va. Code § 29-19-5 | West Virginia requires charities to file IRS Form 990 and Schedule A. It does not mention Schedule B. |
| Wisconsin | No | Wis. Stat. § 202.12<br><br>Wis. Admin. Code DFI-Bkg § 60.08<br><br>Wis. Form #1952 | Wisconsin specifically instructs charities to "not include Schedule B of the 990." Wis. Form #1952 at 5. |

| State | Schedule B Specifically Demanded | Governing Authorities | Notes |
|---|---|---|---|
| Wyoming | No | -- | Wyoming does not require charities to submit an annual report. |

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 20, 2017, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Derek L. Shaffer*
Derek L. Shaffer

*Counsel for Americans for*
*Prosperity Foundation*